# IN THE SUPREME COURT OF IOWA

No. 18–0809

Filed February 28, 2020

**TOBY THORNTON,**

    Appellee,

vs.

**AMERICAN INTERSTATE INSURANCE COMPANY,**

    Appellant.

_____

Appeal from the Iowa District Court for Pottawattamie County, James S. Heckerman, Judge.

Defendant appeals from the district court judgment entered on a jury verdict awarding plaintiff compensatory and punitive damages in his action for first-party bad faith in connection with a workers' compensation claim. **REVERSED AND REMANDED WITH INSTRUCTIONS.**

Stephen H. Locher, Mark McCormick, and Matthew D. Callanan of Belin McCormick, P.C., Des Moines, for appellant.

Tiernan T. Siems and Karen M. Keeler (until withdrawal) of Erickson Sederstrom, P.C., Omaha, Nebraska, for appellee.

**APPEL, Justice.**

This case involves an appeal by a workers' compensation insurance carrier on retrial of a lawsuit where a severely injured plaintiff, indisputably injured at work, claimed that the insurance carrier acted in bad faith to delay the receipt of benefits to which the injured worker was entitled. The jury returned a verdict in favor of the plaintiff for $382,000 in compensatory damages and $6,750,000 in punitive damages. The insurer appealed.

On appeal, the insurer claims there was insufficient evidence to support the amount of compensatory damages awarded by the jury. The insurance company asserts we should remit the $382,000 in compensatory damages to a total of no more than $57,145.

In addition, the insurance company challenges the jury's award of $6,750,000 in punitive damages as violating due process under the Due Process Clauses of both the Iowa and the United States Constitutions. Indeed, the insurance company claims that under applicable caselaw, the jury's award of punitive damages should be remitted to a roughly 1:1 ratio with the compensatory damages.

For the reasons expressed below, we conclude that the compensatory award must be reduced to $58,452.42. On the question of punitive damages, we conclude that under the Federal Due Process Clause, the maximum amount of punitive damages that may be awarded under the facts and circumstances of this case is $500,000. For reasons expressed below, the case is remanded to the district court to enter judgment for the plaintiff in the amount of $558,452.42.

**I. Procedural and Factual Background.**

**A. The Accident and Its Aftermath.** On June 25, 2009, Toby Thornton was driving a truck for Clayton County Recycling in northeast

Iowa. *Thornton v. Am. Interstate Ins.* (*Thornton I*), 897 N.W.2d 445, 452 (Iowa 2017). Thornton lost control of the rig when the load he was transporting shifted. *Id.* His truck rolled over, crushing the cab with Thornton inside. *Id.* As a result of the accident, Thornton sustained serious injuries resulting in paralysis below the chest, no use of his left hand, and only limited use of his right hand. *Id.* There was no dispute that the injury incurred in the course of his employment. Clayton Recycling's workers' compensation insurer was American Interstate Insurance Company. *Id.*

**B. Workers' Compensation Benefits and Proceedings.** Shortly after the accident, American Interstate began providing workers' compensation benefits to Thornton. *Id.* Thornton initially hired counsel who engaged in correspondence with American Interstate regarding wage information for Thornton for a year prior to the accident. *Id.* No formal proceedings arose from these communications. Ultimately, however, Thornton, through new counsel, sought the intervention of the Iowa Workers' Compensation Commissioner on three occasions in order to enforce what he saw as his rights to benefits under Iowa law. *Id.* at 454–57.

First, Thornton obtained a ruling from a deputy commissioner on May 23, 2013, that he was permanently and totally disabled (PTD) as a result of the work-related accident. *Id.* at 455. Second, Thornton obtained a grant of partial commutation of his workers' compensation benefits from a deputy commissioner by petition on May 16, 2014. *Id.* at 456. Finally, on October 21, Thornton filed a petition for alternate medical care with the commissioner related to Thornton's need for a new wheelchair. *Id.* at 457. With respect to the wheelchair, American Interstate conceded that a replacement wheelchair was "reasonable and necessary," leading the

deputy commissioner to order American Interstate to provide a new wheelchair on November 4, with the observation that both parties were in agreement on the matter. *Id.*

**C. First Bad-Faith Action.** On December 26, 2013, Thornton filed a bad-faith action against American Interstate. *Id.* at 457. The parties filed cross-motions for summary judgment. *Id.* The district court granted Thornton's motion for summary judgment in part and denied American Interstate's motion. *Id.* at 458. The district ruled, as a matter of law, that American Interstate acted in bad faith with respect to its challenge to Thornton's claim for PTD benefits and for partial commutation. *Id.* The question of any bad faith prior to March 11, 2013, and the issue of damages was left to the jury. *Id.*

In this first trial of the bad-faith claim, the jury found that American Interstate acted in bad faith as of September 1, 2009, correlating with the alleged refusal of American Interstate to provide wage information and intracompany recognition of PTD. *Id.* at 459. The jury awarded the following damages:

| | |
|---|---|
| Past pain and suffering: | $125,000 |
| Loss of use of money: | $14,000 |
| Lost home equity: | $27,000 |
| Consequential damages: | $118,000 |
| **TOTAL** | **$284,000** |

*Id.* at 460. In addition, the jury awarded punitive damages of $25 million. *Id.* The district court denied American Interstate's posttrial motions for judgment notwithstanding the verdict, remittitur, and new trial. *Id.*

**D. Appeal of First Bad-Faith Action.** American Interstate appealed denial of their posttrial motions, and Thornton cross-appealed denial of attorney fees related to the bad-faith claim. *Id.* at 451. On

appeal, we held that the district court had properly found, as a matter of law, that American Interstate knew or should have known it lacked any reasonable basis to dispute Thornton's PTD status. *Id.* at 466.

At the same time, we found the district court erred in concluding that American Interstate committed bad faith by offering to settle the matter on a closed-file basis. *Id.* We also held that American Interstate was entitled to a motion for directed verdict and that the district court erred in instructing the jury on Thornton's claim that it improperly resisted his claim for partial commutation. *Id.* at 470. We concluded that "American Interstate was not in bad faith for resisting commutation because Thornton's petition for commutation was fairly debatable on its facts." *Id.* (emphasis omitted).

On a third issue, we held there was sufficient evidence for a reasonable jury to conclude that the delay in replacing Thornton's wheelchair caused him to suffer from bursitis and cellulitis which led to a hospitalization. *Id.* at 473. We did not address any questions related to liability of American Interstate with respect to the wheelchair question.

With respect to damages, however, we declined to address a number of issues. Specifically, we declined to address the sufficiency of the evidence to support instructions on the loss of the use of money and home equity. *Id.* at 474. We also had no occasion to address the question of punitive damages, as the case was remanded for a new trial.

On the question of whether Thornton's attorney fees for the bad-faith action may be recovered from American Interstate, we concluded that the district court correctly refused to instruct the jury that these fees were allowable damages and denied Thornton's posttrial motion for fees. *Id.* at 474–75.

**E. Overview of Second Trial of Bad-Faith Claim.** As a result of the ruling of this court in the first bad-faith proceeding, four legal parameters were established for the second trial. First, as a matter of law, American Interstate, beginning at least as soon as March 11, 2013, engaged in bad faith on the PTD question. *Id.* at 466. Second, also as a matter of law, American Interstate did not engage in bad faith related to the issue of partial commutation. *Id.* Third, with respect to causation, a triable issue was generated on the question of mind and body damages arising from the alleged bad-faith delay in the provision of a new wheelchair to Thornton. *Id.* at 476. Fourth, attorney fees related to the bad-faith claims of Thornton were not recoverable from American Interstate. *Id.* at 475–76.

The matter was retried in a five-day trial in February 2018. The evidence was similar, but not identical, to that in the first bad-faith trial. The jury returned a verdict in favor of Thornton. The jury determined that the bad faith of American Interstate began on October 25, 2012. The jury the provided for compensatory damages as follows:

| | |
|---|---|
| Past mental pain and suffering: | $40,000 |
| Past pain and suffering: | $40,000 |
| Loss of use of money: | $150,000 |
| Loss of full mind and body – past | $100,000 |
| Consequential damages: | $52,000 |
| **TOTAL** | **$382,000** |

The jury also found by a preponderance of clear, convincing, and satisfactory evidence the conduct of American Interstate constituted willful and wanton disregard for the rights or safety of another. Further, the jury determined the conduct of American Interstate was specifically directed

toward Thornton. The jury awarded punitive damages in the amount of $6.75 million.

## II. Standard of Review.

A motion for judgment notwithstanding the verdict should be granted if there is not substantial evidence to support the elements of the plaintiff's claim. *Doe v. Cent. Iowa Health Sys.*, 766 N.W.2d 787, 790 (Iowa 2009). A motion for new trial should be granted pursuant to Iowa Rule of Civil Procedure 1.1004(6), (8), and (9) if the "verdict, report or decision is not sustained by sufficient evidence, or is contrary to law" or in the event of "[e]rror[] of law occurring in the proceedings, or mistake[] of fact by the court," or "[o]n any ground stated in rule 1.1003, the motion specifying the defect or cause giving rise thereto."

Where damages are not supported by the evidence, the court may "order a remittitur as a condition to avoiding a new trial." *Jasper v. H. Nizam, Inc.*, 764 N.W.2d 751, 777 (Iowa 2009). When ordering remittitur, the court "award should be reduced 'to the maximum amount proved' under the record." *Id.* (quoting *In re Knickerbocker*, 827 F.2d 281, 289 n.6 (8th Cir. 1987)). There is authority, however, for the proposition that the court may enter judgment in a lower amount in appropriate circumstances. *Midland Mut. Life Ins. v. Mercy Clinics, Inc.*, 579 N.W.2d 823, 835 (Iowa 1998).

Challenges to the amount of punitive damages under the Due Process Clause of the United States Constitution are reviewed de novo. *Cooper Indus., Inc. v. Leatherman Tool Grp., Inc.*, 532 U.S. 424, 436, 121 S. Ct. 1678, 1685–86 (2001) ("[C]ourts of appeals should apply a *de novo* standard of review when passing on district courts' determinations of the constitutionality of punitive damages awards."); *see also Simon v. San Paolo U.S. Holding Co.,* 113 P.3d 63, 70 (Cal. 2005) ("In deciding

whether an award of punitive damages is constitutionally excessive under *State Farm* [*Mutual Automobile Insurance Co. v. Campbell*, 538 U.S. 408, 123 S. Ct. 1513 (2003),] and its predecessors, we are to review the award de novo, making an independent assessment of the reprehensibility of the defendant's conduct, the relationship between the award and the harm done to the plaintiff, and the relationship between the award and civil penalties authorized for comparable conduct.").

**III. Alleged Bad Faith Arising from Delay in Provision of Wheelchair.**

**A. Introduction.** In the appeal of the first bad-faith trial, we held there was sufficient evidence to support causation of substantial damages arising from the delay of several months in providing Thornton a replacement wheelchair. *Thornton I*, 897 N.W.2d at 473–74. As a consequence, American Interstate does not challenge the causation of the alleged pain and suffering and loss of body and mind in this appeal and on cross-appeal. According to Thornton, damages for pain and suffering and loss of mind and body arise from injuries suffered by Thornton due to American Interstate's bad-faith acts and omissions related to the delay in providing Thornton with his replacement wheelchair.

At the second bad-faith trial, however, the parties aggressively litigated the question of whether American Interstate was liable for bad faith in connection with the alleged delay in providing the wheelchair. In this appeal, American Interstate asserts that in the second bad-faith trial there was no substantial evidence in the record to support the jury's finding that the company engaged in bad faith in connection with replacement wheelchair.

On the other hand, Thornton claims the evidence clearly establishes that American Interstate showed disregard for the rights of Thornton by

failing to see that he received a replacement wheelchair in a timely manner. Thornton claims that he was injured because of the delay. He further claims that evidence of his injuries arising from the delay supports the $180,000 in damages for pain and suffering and loss of mind and body awarded by the jury.

In reviewing a jury verdict for sufficiency of the evidence, we review the evidence in the light most favorable to sustaining the jury's verdict. *Revere Transducers, Inc. v. Deere & Co.*, 595 N.W.2d 751, 763 (Iowa 1999).

**B. Overview of Evidence at Trial Related to Alleged Bad-Faith Delay in Replacing Wheelchair.**

1. *Process for ordering a wheelchair.* Ever since his hospital discharge in October 2009, Thornton has required the use of a wheelchair. A wheelchair lasts for about five years. On July 1, 2014, Dr. Rogge, Thornton's regular physician, prescribed a new wheelchair for Thornton. A progress note generated by Dr. Rogge on August 4 stated that the prescription had been written and that progress note was in American Interstate's files.

In order to obtain a wheelchair, more than a prescription is needed. A wheelchair for a disabled person is not an off-the-shelf item, but rather, is custom built. Thornton is a large person who needed to be measured so that the wheelchair was right-sized. In addition, specific needs also must be addressed in wheelchair construction in a process referred to as a mobility evaluation. Once the mobility evaluation is complete, a durable medical equipment order, or DME order, is prepared with specific equipment and pricing for approval. A prescription thus does not directly lead to a new wheelchair but instead sets in motion a process that leads to delivery of custom equipment.

2. *July 1 prescription.* While the prescription was written by Dr. Rogge on July 1, there is no documentary evidence in the trial record of any further action taken in the month of July by Dr. Rogge, Thornton, or American Interstate in connection with fulfilling the prescription. Dr. Rogge testified, however, with respect to the prescription,

> [A] lot of times my nurse takes care of this stuff for me, but I believe we sent it to St. Luke's, or something like that, in Cedar Rapids, because I think he was actually getting fit for the new chair or something because he was going to go down and have an appointment.
>
> They were actually going to fit him. It sounded great.

Dr. Rogge's testimony was supported by Jami Rodgers, who succeeded Luann Miller as the American Interstate's claims manager of the Thornton file. According to Rodgers, Dr. Rogge's prescription needed to be sent to St. Luke's rehab where he would then be fitted for the wheelchair.

Thornton at one point stated he sent the prescription to his brother Tim or to his attorneys. He testified that he usually faxed prescriptions to Tim, who then in turn delivered them to Thornton's attorneys. He is not sure when he sent the prescription. When pressed, however, Thornton testified,

> I know I said I sent it [the prescription] to you guys [his attorneys] but I don't recall – I don't – I don't know if I sent it to Timmy or where I sent it. I really don't recall it. I know I said that I did but I don't remember.

Further, his brother Tim remembers a conversation in which the doctor prescribed the wheelchair but did not recall receiving documents about a wheelchair and did not hear anything about the issue from Toby until months later after he still had not received his wheelchair. There is no correspondence in the record between Thornton's counsel and American Interstate's counsel over a wheelchair until September 29. At that time,

as will be seen below, there was no mention of previous correspondence related to a prescription, but only a request that an order be "expedited."

The record further reflects that on October 20, rehabilitation specialist Kevin Moser contacted Tracy Butler, an employee at Call One, a vendor who procures such equipment on behalf of American Interstate's insureds, asking for the status of the wheelchair. Butler responded by noting that she was waiting for the items to be put into the system to generate a "PO," an apparent reference to a purchase order. She stated they were having issues finding the parts necessary for Thornton's wheelchair.

A progress note dated August 4 generated by Dr. Rogge states, "We will continue to do paperwork waiting for him to receive his new wheelchair." The progress note does not describe the nature of the paperwork that Dr. Rogge would "continue to do."

3. *September 17 mobility evaluation.* On September 17, six weeks after Dr. Rogge wrote the original prescription, Thornton received a mobility evaluation at St. Luke's Hospital. There is nothing in the record to suggest why the mobility evaluation did not occur until September 17.

The September 17 mobility evaluation states that Thornton was "referred to the Mobility-Seating Clinic" but does not expressly state by whom. The mobility evaluation states that Thornton has had repairs to his chair over the years, the front riggings and frame are "still bent," the back is worn out, the motor is making noises, and the integrity of the chair is "very questionable." The current chair is described as "no longer safe or functional."

The mobility evaluation proceeded to evaluate Thornton's needs and recommended eleven types of powered mobility-assistive equipment. The evaluation then has several pages of single-spaced justification for the

recommended equipment. On September 19, Dr. Rogge signed the mobility evaluation stating, "I have reviewed the above evaluation and concur with the prescribed equipment."

4. *September 19 DME order.* On September 19, a DME order was generated. The DME order has a description of twenty-three items required for Thornton's new wheelchair and an itemized cost for each item. On September 22, 2014, Dr. Rogge signed the DME order which declared, "I authorize the items/services shown above & certify that the information provided herein is accurate."

5. *American Interstate action in response to September 29 correspondence with Thornton's counsel.* On September 29, Thornton's attorney received an email from Moser. The Moser email states that he attached information about a power wheelchair. Thornton's attorney then sent an email to American Interstate's counsel, stating,

> I imagine this has already been sent to Jami Rodgers but if you could please expedite, I'm sure the mobility folks would appreciate it. Also, considering that Toby is severely overdue with a replacement chair, we need to streamline this process.

American Interstate's counsel forwarded the email to American Interstate's claims manager assigned to Thornton, Rodgers. She in turn submitted the information to One Call. American Interstate, however, does not advise Thornton's attorney of the action it had taken.

On October 10, One Call sent an email to Rodgers asking for "authorization" for the wheelchair. She provided the authorization on the same day.

6. *Thornton's hospitalization on October 12.* Thornton saw his doctor about bursitis/cellulitis on his arms on October 12. His arms had swollen up to twice the normal size. Thornton was hospitalized for several days in extreme pain as a result of the problem. He was given IV

13

antibiotics to address the infection. Thornton testified the new wheelchair has wider armrests and is more padded; the old wheelchair had thin armrests and he would hit his arms a lot going through doorways.

7. *October 21 filing of alternate medical care proceeding and related correspondence.* On October 20, Thornton's attorney sent a letter to American Interstate's counsel stating that the delay in getting the wheelchair was unacceptable. On October 21, Thornton filed a petition for alternate medical care in which he alleged that American Interstate refused to authorize the wheelchair. As established above, American Interstate admitted liability for the work injury and admitted causal connection of the need for a wheelchair to the covered injury.

Two days later, on October 23, Thornton's counsel sent a letter to American Interstate's counsel stating, "[I]t's unfortunate that it requires litigation to get Toby even the most basic of needs associated with this claim." American Interstate's attorney forwarded the October 23 letter to American Interstate, characterizing the letter as "more drivel" from Thornton's counsel. On October 23, American Interstate's counsel contacted Thornton's counsel and advised that One Call stated the wheelchair was in the process of being ordered and would take approximately three weeks for the chair to be shipped.

8. *November 4 hearing on alternate medical care.* The deputy commissioner set a telephonic hearing on the petition for alternate medical care for November 4. Prior to the hearing, an American Interstate file manager asked counsel to "slap [Thornton's counsel] around at the hearing." At the hearing, however, American Interstate conceded that the replacement wheelchair was reasonable and necessary. *Thornton I*, 897 N.W.2d at 457. The deputy commissioner thus noted that there was not "truly a justiciable controversy pending." The deputy commissioner

entered a consent order that the wheelchair be provided as consistent and acceptable to both parties. *Id.*

**C. Discussion.** There can be no question there was substantial evidence in the record to show that Thornton was in need of a wheelchair on July 1, 2014, and this fact was reflected in progress notes in Thornton's case file maintained by American Interstate. There is no substantial evidence in the record to show, however, that the prescription was sent to American Interstate by Thornton, Thornton's counsel, or any healthcare provider. What evidence there is in the record indicates that the prescription was sent to St. Luke's, where the mobility evaluation would eventually be conducted. It is difficult to see how American Interstate was required to take any action when it simply received a progress note that Dr. Rogge had prescribed a new wheelchair and the prescription was forwarded to St. Luke's for further action.

It is undisputed that in order to obtain a replacement wheelchair, a mobility examination must be first conducted. There was no evidence in the record explaining why Thornton's mobility examination was not conducted until September 17, more than ten weeks after the original prescription was made. More specifically, there is no evidence in the record to suggest that American Interstate did anything to hinder or delay Thornton's mobility evaluation.

After the mobility evaluation was completed, a DME order was prepared on September 19 and signed by Dr. Rogge on September 22. The few days between the mobility order and the development of the DME order, and between the date of the DME order and Dr. Rogge's authorizations, are not extraordinary and seem typical of an ordinary course of business. In any event, there was no evidence that American Interstate had anything to do with these brief delays.

American Interstate was not aware of any issue regarding the delay in the replacement of Thornton's wheelchair until Thornton's counsel sent an email to American Interstate's counsel on September 29. That same day, Rodgers contacted One Call, its vendor who procures such equipment, about the wheelchair issue. Unfortunately, American Interstate did not advise Thornton's counsel about the action that had been taken. On October 10, One Call asked for authorization for the wheelchair replacement and Rodgers provided such authorization that same day. Again, American Interstate did not notify Thornton's counsel of the action taken.

Unfortunately, before the wheelchair was available, Thornton developed bursitis/cellulitis and was hospitalized with a severe infection for several days; yet there was no substantial evidence that this event was a result of a denial of benefits, or unreasonable delay, caused by American Interstate.

Under the circumstances, we do not think Thornton has established a bad-faith claim against American Interstate on the wheelchair issue. An insurer is liable for bad faith only when the evidence shows "(1) that the insurer had no reasonable basis for denying benefits under the policy," and "(2) the insurer knew, or had reason to know, that its denial was without basis." *Thornton I*, 897 N.W.2d at 461–62 (quoting *McIlravy v. N. River Ins.*, 653 N.W.2d 323, 329 (Iowa 2002)). A denial may occur when an insurer "unreasonably . . . delays delivery of necessary medical equipment." *Id.* at 465. Here, however, there is no substantial evidence that American Interstate knowingly or recklessly disregarded its obligation to provide the equipment in a timely manner. *See Dolan v. Aid Ins.*, 431 N.W.2d 790, 794 (Iowa 1988) (en banc) (outlining and applying the two-pronged bad-faith standard); *see also Quinones v. UnitedHealth Grp. Inc.*,

250 F. Supp. 3d 692, 704–05 (D. Haw. 2017) (finding no bad faith where insurance company had nothing to approve), *aff'd*, 782 F. App'x 646, 647 (9th Cir. 2019). Delays caused by the insured cannot be attributed to the insurer.

Thornton bolsters his claim by noting that American Interstate's counsel referred to Thornton's counsel's October 23 correspondence claiming American Interstate refused to authorize the replacement wheelchair as "more drivel." Such colorful characterizations by counsel do not assist American Interstate in its defense of a bad-faith claim. It is clear, however, that the statement related to the claim made by Thornton's counsel that it was necessary for him to file the petition for alternate medical care when, in fact, American Interstate had authorized the replacement wheelchair for Thornton ten days earlier. Indeed, American Interstate, through timely notification to Thornton's counsel of its action, might have been able to avoid the petition altogether.

For the above reasons, we conclude that Thornton failed to produce substantial evidence to support his bad-faith claim based on delay in the receipt of the replacement wheelchair. As a result, there was no legal basis for awarding $100,000 in damages for loss of mind and body and $80,000 in damages for physical and mental pain and suffering that Thornton claimed he suffered as a result of American Interstate's alleged bad faith.

**IV. Compensatory Damages Arising from Bad-Faith Denial of PTD.**

**A. Introduction.** With respect to the replacement wheelchair issue, the prior appeal addressed the question of causation of damages but did not address the underlying question of American Interstate's liability. In contrast, with respect to Thornton's claim that American Interstate acted in bad faith by denying Thornton's PTD claim, the prior

appeal resolved the issue of liability in favor of Thornton but did not address the issue of damages.

At the second bad-faith trial, Thornton claimed several categories of damages arising from American Interstate's bad faith in connection with the PTD issue. First, he claimed the delay in obtaining a PTD determination in turn imposed an equal delay on obtaining a partial commutation of his workers' compensation benefits. As a result, Thornton claimed he lost the use of money for a period of time in excess of a year. On this theory, Thornton claimed, and the jury appears to have awarded, $114,000.

Second, Thornton claimed that if he had received his partial commutation in a timely fashion, he would have not lost the opportunity to buy a one-story ranch house in Monona that Thornton had obtained preapproval to purchase from a local bank. On this theory, Thornton claimed $45,000 in damages, but it appears the jury awarded him a somewhat lesser sum of $36,000 in damages.

Finally, Thornton claimed he was entitled to recover attorney fees in excess of $52,000 that were incurred allegedly because of the bad-faith actions of American Interstate. The jury awarded him $52,000 on this claim.

The jury in the second bad-faith case established one guidepost that was different than that imposed by the jury in the first bad-faith case. While the first bad-faith case returned a special verdict stating that the bad faith of American Interstate commenced on September 1, 2009, the jury in the second bad-faith case determined that the bad faith of American Interstate occurred at the significantly later date of October 25, 2012.

In evaluating whether there was substantial evidence to support the damages awarded by the jury, we must affirm the verdict to the greatest extent allowed by law. *Clarey v. K-Prods., Inc.*, 514 N.W.2d 900, 903 (Iowa 1994).

**B. Loss of Use of Money.** Thornton asserts that if he had received his partial commutation in a timely fashion, namely, about a year earlier than he actually received it, Thornton would have invested the more than $750,000 in the Standard & Poors (S&P) 500 rather than the much more conservative "Dentist Fund" managed by AMP Wealth Management. He claims that if the lump-sum had been paid earlier and before he incurred expenses such as attorney fees, he could have taken greater risks with his lump-sum payment.

Thornton's brother, an accountant who served as a financial advisor to Thornton, concurred with the idea that if the lump-sum had been paid earlier, Thornton "would have been able to be a bit little [sic] more risky with his investment." Thornton's expert Jerome Sherman calculated that had he received the lump-sum payment more than a year earlier and invested the funds in the S&P 500, he would have accumulated an additional $114,000. Sherman refused to say, however, whether he would recommend such a strategy for someone in Thornton's position but only performed the calculation of damages assuming Thornton elected to invest the entire sum of his partial commutation in an S&P Index Fund.

American Interstate rejects the argument. American Interstate first argues that in order to obtain a partial commutation, Thornton represented to the deputy commissioner that the funds would be conservatively invested in a conservative AMP Wealth Management Fund, referred to by the parties as the Dentist Fund. In order to obtain partial commutation, Thornton had the burden of showing the "reasonableness

of [his] plans for using the lump sum proceeds." *Dameron v. Neumann Bros., Inc.*, 339 N.W.2d 160, 164 (Iowa 1983). In approving the partial commutation, the deputy noted that

> there is minimal risk that claimant's funds will be significantly depleted through his stated investment plan. He has demonstrated a conservative investment approach and is not likely to lose a significant portion of the commuted funds in the conservative approach he testified he intends to pursue.

American Interstate argues that without such a representation, the deputy commissioner would not have approved the partial commutation.

As a result, American Interstate argues that Thornton is judicially or collaterally estopped from suggesting that had funds been paid more timely, he would have taken more risks in his investment. *See Winnebago Indus., Inc. v. Haverly*, 727 N.W.2d 567, 573–75 (Iowa 2006) (enumerating the rationale underlying the doctrine of judicial estoppel); *United Fire & Cas. Co. v. Shelly Funeral Home, Inc.*, 642 N.W.2d 648, 654–55 (Iowa 2002) (outlining the rationale underlying the doctrine of collateral estoppel). In any event, American Interstate argues that there is no evidence that Thornton in fact would have invested his funds in the riskier S&P 500 had he received his lump-sum partial commutation a year earlier. *See Renze Hybrids, Inc. v. Shell Oil Co.*, 418 N.W.2d 634, 638–39 (Iowa 1988) (finding theoretical deprivation of interest earned in investment as too speculative to uphold).

On this issue, we agree with American Interstate. The record simply does not offer substantial support for Thornton's claim that he would have invested his lump-sum partial commutation in the riskier S&P 500 had the delay in payment not occurred.

We reach this conclusion based on the evidence at trial. The purpose of a lump-sum payment as part of a partial commutation in this

case was to give the claimant the means to make an investment large enough to support an income stream at least equivalent to the income benefits to which he or she would be entitled to under workers' compensation. Because maintaining the income stream is of great importance to Thornton, one would ordinarily expect Thornton to invest the funds conservatively in income-producing investments and not riskier equity funds. The deputy commissioner in this case understandably expressly relied upon Thornton's conservative investment strategy in deciding to award partial commutation in this case.

The record shows that Thornton and his support group endorsed the notion that lump-sum funds should be conservatively invested. His brother Tim testified that the S&P 500 was not an appropriate investment vehicle and that the plan was always to invest in the Dentist Fund. Thornton's investment advisor stated that he would have recommended the same fund even if he got the money immediately after the accident. And, when he received his partial commutation, he in fact invested the entire amount in the Dentist Fund.

Of course, we can never reconstruct counterfactual scenarios with complete assurance. But the suggestion that Thornton would have invested his lump-sum in the S&P 500 has no support in the evidence. Nobody, neither Thornton, his brother Tim, his financial consultant, nor his trial expert, testified that it would have been a good idea to make such a risky investment. Indeed, Thornton himself admitted at trial that he could not take the risk of a stock market crash. It is doubtful that the deputy commissioner would approve a partial commutation with such a plan. Although it might be theoretically conceivable, the notion that Thornton would have invested his lump-sum payment in the comparatively risky S&P 500 is far too speculative to support damages in

this case. *See Olson v. Nieman's, Ltd.*, 579 N.W.2d 299, 309 (Iowa 1998) ("Damages are denied where the evidence is speculative and uncertain whether damages have been sustained."); *Patterson v. Patterson*, 189 N.W.2d 601, 605 (Iowa 1971).[1]

For the above reasons, we conclude, as a matter of law, that Thornton is not entitled to damages on his lost-use theory.

**C. Lost Real Estate Opportunity.** At trial, Thornton asserted that he planned to purchase a ranch house in Monona and would have closed on the transaction had American Interstate not resisted a finding of PTD, which had the effect of delaying his partial commutation by approximately a year. He asserted that by the time he received his belated partial commutation, the house he wanted to buy had been sold. When he finally did receive the lump-sum payment, Thornton argued that he was no longer in a financial position to purchase a home.

Thornton claimed that if he had closed on the purchase of the ranch, he would have made mortgage payments in the amount of $739 per month instead of rental payments of $750–$800 per month. If he had made mortgage payments instead of rental payments, Thornton argued he would be accumulating equity in the home rather than simply throwing away his money in rent. As a measure of his damages, Thornton asserted that the jury should award him the cumulative value of his rental payments over the past five years, or $45,000.

---

[1]Thornton sought damages for lost use of money on the theory that if the partial commutation would have occurred earlier, he would have invested some or all of the funds in either the S & P Index Fund or a managed fund earning an 8% annual return. American Interstate's expert calculated damages using the Dentist Fund but concluded that damages for any delay resulting from American Interstate's bad faith, after credit for weekly payments made during the delay period, would be "approximately zero or negative."

American Interstate counters that although the real estate transaction considered by Thornton was not consummated, he failed to show how he was damaged by the lost opportunity. American Interstate notes that Thornton's expert made no effort to quantify the amount of home equity that might have accumulated in a putative mortgage had the transaction on the ranch house been closed. Further, most of a mortgage payment would not have gone to equity but instead would have included interest, taxes, and homeowner insurance. In addition, as a homeowner, Thornton would have incurred repair, maintenance, and upkeep costs that he was not responsible for as a renter. In short, American Interstate argues that the evidence does not establish how Thornton has been harmed by the failure to close the real estate transaction.

We agree with American Interstate. Monthly rental payments do not represent accumulating home equity. Only a small portion of any mortgage payment, especially in the initial years of a mortgage, is allocated to principal. Margaret C. Jasper, *Home Mortgage Law Primer* § 2:31, Westlaw (database updated Oct. 2012). Although this number is ordinarily ascertainable, Thornton elected to present no evidence as to what the principal accumulation would have been in the first years of the putative mortgage.

In addition, while Thornton would have been making payments toward principal on the loan supporting the mortgage, he would have incurred increased costs of ownership including maintenance and repair costs, utility costs, snow removal, et cetera, which would offset any earned equity. Further, while the principal due on the house may have been reduced somewhat through mortgage payments, the market price of the house may also have fallen over time, thus undercutting any financial advantage he may have obtained through homeownership.

Of course, there are intangible benefits of homeownership, but in this bad-faith case we need to focus on compensable damages. Those who buy (and sell) homes know that they are not necessarily better-off financially because of homeownership, either in the short or long run. It is quite plausible that Thornton is economically better-off continuing to rent his current small apartment than if he owned a larger home with an ordinary thirty-year mortgage.

It might have been possible for Thornton to concretely show damages arising from the lost opportunity to buy the ranch home. Any such figure, of course, would likely have been much smaller than the $45,000 claimed by Thornton. Given the record in this case, we conclude there is no substantial evidence to show that Thornton was economically harmed by the collapse of the transaction involving the purchase of a home, which he claimed was caused by the bad-faith conduct of American Interstate. *See Pavone v. Kirke*, 801 N.W.2d 477, 495 (Iowa 2011) ("[S]ome speculation on the amount of damages sustained is acceptable; however, overly speculative damages cannot be recovered."); *Data Documents, Inc. v. Pottawattamie County*, 604 N.W.2d 611, 616 (Iowa 2000) ("As a general rule, the party seeking damages bears the burden of proving them; if the record is uncertain and speculative as to whether a party has sustained damages, the factfinder must deny recovery."); *Jamison v. Knosby*, 423 N.W.2d 2, 6 (Iowa 1988) ("Under general damage principles, overly speculative damages cannot be recovered."); *Robinson v. Perpetual Servs. Corp.*, 412 N.W.2d 562, 567 (Iowa 1987) (holding amount of damages need not be established with precision, but there must be a reasonable basis in the record from which the amount of damages may be inferred).

**D. Consequential Damages: Attorney Fees.** Thornton claims that as a result of American Interstate's bad-faith conduct, he was forced to

incur attorney fees. The jury awarded him a total of $52,000. Thornton notes that Jury Instruction No. 29 defined consequential damages as "[a]ttorney fees and all other damages incurred which were necessary in recovering the workers' compensation benefits to which Plaintiff was entitled." The evidence shows, according to Thornton, that he incurred a total of $52,301.46 in attorney fees related to his workers' compensation claim from 2009 to 2018. He further states that the jury "also heard evidence regarding damages Thornton incurred throughout his workers' compensation claim."

Thornton impliedly recognized that under *Thornton I*, he is not entitled to attorney fees litigating the bad-faith claim itself. *Thornton I*, 897 N.W.2d at 474–75. He thus urges us to "amend the jury verdict to reflect a date of bad faith commencing on September 1, 2009." According to Thornton, American Interstate in 2009 knew it had a duty to provide wage information to Thornton yet failed to do so without a reasonable basis. By so amending the jury verdict, attorney fees incurred early on in this workers' compensation case could be included in the recovery.

American Interstate disagrees. American Interstate emphasizes that Thornton is not entitled to attorney fees prior to October 25, 2012, the date when the jury found that American Interstate's bad faith commenced. Further, Thornton is not entitled to attorney fees for litigation in his bad-faith claims under *Thornton I*.

At the outset, we reject the notion that the jury instructions permitted the jury to award attorney fees for any part of Thornton's workers' compensation representation. Instruction No. 29 does generally state that Thornton is entitled to attorney fees necessarily incurred in obtaining the benefits to which Thornton "was entitled." In context, and with other instructions, it is clear that the entitlement referred to was

*benefits resisted by American Interstate due to its bad-faith conduct.* For example, Instruction No. 1 states that the jury is to consider whether the company "acted in bad faith" and "determine whether plaintiff . . . was damaged by defendant's [bad-faith] actions. Instruction No. 18 emphasized that "to recover for bad faith," the jury must determine that the denial of the plaintiff's claim "was a proximate cause of damage to the plaintiff." Instruction No. 18 further states that if the plaintiff "failed to prove any of the[] propositions, the plaintiff is not entitled to damages." Instruction No. 18 thus plainly links damages to the bad-faith actions of American Interstate.

In examining Thornton's fee claim, we begin by eliminating the claim for fees prior to October 15, 2012.[2] This eliminates $24,185.38 from the fee claim. On the other end of the time spectrum, we eliminate fees claimed for events after the end of the PTD litigation of $9,663.66. If we subtract out these fees, the amount that is left is $18,452.42.

Finally, American Interstate indicates there is $1,407.42 in unspecified fees accrued in the period between February 2012 and January 2018. Other than this generalized description, American Interstate does not identify the "unspecified fees" it claims should not be reimbursed. We require more of a challenge attacking an award of attorney fees.

"We review a challenge to a district court's grant of attorney fees for an abuse of discretion." *NevadaCare, Inc. v. Dep't of Human Servs.*, 783 N.W.2d 459, 469 (Iowa 2010). This court will only reverse the trial court's

---

[2]While the jury found that the bad faith of American Interstate commenced on October 25, 2012, Thornton invites this court to "amend the jury verdict" to reflect a date of bad faith commencing on September 1, 2009, thereby providing a basis for an award of attorney fees incurred prior to October 24, 2012. We decline to so amend the jury's verdict.

ruling when the ruling is clearly unreasonable or untenable. *Gabelmann v. NFO, Inc.*, 606 N.W.2d 339, 342 (Iowa 2000). Therefore, there is no basis for reduction of consequential damages in that amount. We conclude the record supports consequential damages for attorney fees in the amount of $18,452.42.

**E. Uncontested Award of Damages for Mental Pain and Suffering Damages.** The jury awarded $40,000 for mental pain and suffering damages. Such damages are permitted in bad-faith actions. *Niblo v. Parr Mfg., Inc.*, 445 N.W.2d 351, 354–55 (Iowa 1989) (en banc). Thornton argues that American Interstate does not contest this aspect of the jury award, a proposition that American Interstate does not dispute in its reply brief. We therefore do not disturb the jury's award of these damages.

**F. Total Compensatory Damages.** Viewed in the light most favorable to the verdict, the evidence in this case supports an award of $18,452.42 in attorney fees and $40,000 for mental pain and suffering. The cumulative total of compensable damages supported by the evidence is $58,452.42.

Under Iowa Rule of Civil Procedure 1.1010(2), an appellate court may impose a term or condition, forcing parties to choose between "a reduced, modified or increased judgment amount or proceeding to a new trial." This court may set aside a verdict failing to secure justice for the parties, not on the basis of verdict amount, but because a jury ignores uncontroverted evidence resulting in injustice. *See Moore v. Bailey*, 163 N.W.2d 435, 437 (Iowa 1968); *Henrich v. Oppedal*, 248 Iowa 509, 511, 81 N.W.2d 429, 430 (1957). This court has also found that if a verdict award is inappropriate merely due to lack of sufficient evidence, remittitur may be ordered in the interest of justice as a condition for avoiding a new trial.

*See WSH Props., L.L.C. v. Daniels*, 761 N.W.2d 45, 49–50 (Iowa 2008); *Schmitt v. Jenkins Truck Lines, Inc.*, 170 N.W.2d 632, 659 (Iowa 1969).

Here, however, we have determined, as a matter of law, no damages may be awarded for lost use of money and lost real estate opportunity. Where no damages may be awarded as a matter of law, there is no basis for conditional remittitur with a right to a new trial. A new trial would be pointless on the issue as the only permissible award on these theories is zero.

That leaves us with the question of attorney fees as compensatory damages. With respect to our reduction of the award of attorney fees, there is also no basis for conditional remittitur. As a matter of law, Thornton was not entitled to attorney fees for litigating his bad-faith claim. No jury award of any amount of attorneys' fees would be sustainable on the bad-faith claim. In addition, Thornton was not entitled to attorney fees that were incurred outside the dates the jury found American Interstate began to engage in bad faith and the determination of the workers' compensation commissioner on the partial commutation issue. In short, the amount of attorney fees awardable during this timeframe was a liquidated amount.[3] *See Westchester Fire Ins. v. Hanley*, 284 F.2d 409, 418 (6th Cir. 1960); *Christian v. Smith*, 759 N.W.2d 447, 463 (Neb. 2008); *see also* Charles Alan Wright et al., *Federal Practice and Procedure* § 2815 & n.2, at 208 (2012 & Supp. 2019). To the extent any challenge was launched on the reasonability of those claims, we have rejected them. Thus, under our disposition, Thornton has received the entire amount of attorney fees claimed during the qualifying time period.

---

[3]No party challenges the jury's factual finding regarding when American Interstate's bad-faith claim commenced.

Under these narrow circumstances, we conclude that a conditional remittitur is not required. Instead, we conclude that on remand the district court should enter judgment on behalf of the plaintiff in the sum of $58,452.42 in consequential damages.

**V. Punitive Damages.**

**A. Introduction.** The question of propriety and amount of punitive damages has been a significant issue in Anglo-American law. In order to understand the full context of the punitive damages issue in this case, it is helpful to view the issue within its larger context. As Justice Holmes said some years ago, "In order to know what [the law] is, we must know what it has been, and what it tends to become." Oliver Wendell Holmes, Jr., *The Common Law* 1 (1881).

**B. Ancient, Common Law, and Early State Law Approaches to Punitive Damages.** Punitive damages have ancient lineage. They were part of the Babylonian Code, the Hindu Code of Manu, the Bible, and Roman law. Michael Rustad & Thomas Koenig, *The Historical Continuity of Punitive Damages Awards: Reforming the Tort Reformers*, 42 Am. U. L. Rev. 1269, 1285 (1993) [hereinafter Rustad & Koenig, *Historical Awards*]. The Roman law of punitive damages was designed to constrain wealthy elites who would strike persons unlawfully on the face for sport and then direct a servant to pay ordinary compensation to the victim. *Id.* at 1285–86.

The English courts employed punitive damages to punish and deter misuse of wealth and power. The famous search and seizure case of *Wilkes v. Wood*, where the court awarded substantial exemplary damages, was well known and highly praised in the American colonies. *Wilkes v. Wood*, (1763) 98 Eng. Rep. 489 (KB). Not surprisingly, the doctrine of punitive

damages, though controversial, was transplanted in American soil. *See* Rustad & Koenig, *Historical Awards*, 42 Am. U. L. Rev. at 1290–1304.

**C. Evolving United States Supreme Court Framework for Evaluation of Punitive Damages for "Gross Excessiveness."**

1. *Supreme Court forays into due process limitations on punitive damages.* The Supreme Court for decades had imposed no constitutional limits on punitive damages. But there were hints in recent years of a more aggressive approach. In *Browning-Ferris Industries of Vermont, Inc. v. Kelco Disposal, Inc.*, 492 U.S. 257, 109 S. Ct. 2909 (1989), the Supreme Court rejected the application of the Excessive Fines Clause of the Eighth Amendment, or limitations of federal common law to punitive damages. *Id.* at 259–60, 109 S. Ct. at 2912. The *Kelco* Court noted, however, that a due process challenge for excessiveness had not been raised in the lower courts and was not considered. *Id.* at 276–77, 109 S. Ct. at 2921. At the same time, the *Kelco* Court noted that there is "some authority in our opinions for the view that the Due Process Clause places outer limits on the size of a civil damages award made pursuant to a statutory scheme." *Id.* at 276, 109 S. Ct. at 2921.[4]

In *Pacific Mutual Life Insurance Co. v. Haslip*, 499 U.S. 1, 111 S. Ct. 1032 (1991), the Supreme Court considered a case where an insurance agent diverted premiums for his own use, thereby causing plaintiffs' health insurance, unbeknownst to them, to be cancelled. *Id.* at 4–5, 111 S. Ct. at 1036. The jury found the defendants liable for fraud and imposed

---

[4]*See also Bankers Life & Cas. Co. v. Crenshaw*, 486 U.S. 71, 87–89, 108 S. Ct. 1645, 1655–56 (1988) (O'Connor, J., concurring in part and concurring in the judgment) (characterizing due process issue regarding punitive damages as serious but not raised in the case); *Aetna Life Ins. v. Lavoie*, 475 U.S. 813, 828–29, 106 S. Ct. 1580, 1589 (1986) (characterizing due process and excessive fines challenges to imposition of punitive damages as "important issues" that must be resolved but not necessary to do so in the case before the Court).

punitive and compensatory damages. *Id.* at 6–7, 111 S. Ct. at 1036. The jury returned a general verdict on damages, but the *Haslip* Court assumed, based upon Haslip's argument to the jury, that Haslip received punitive damages of not less than $840,000 and compensatory damages of $200,000. *Id.* at 7 n.2, 111 S. Ct. at 1036 n.2.

Justice Blackmun's opinion opened with a respectful review of common law punitive damages tradition. *Id.* at 15–18, 111 S. Ct. at 1041–43. Quoting the well-known, movie-inspiring modern case of *Silkwood v. Kerr-Magee* and citing the historically celebrated, revered, and politically powerful case of *Wilkes v. Wood*, the *Haslip* Court noted that "[p]unitive damages have long been a part of traditional state tort law." *Id.* at 15, 111 S. Ct. at 1041–42 (quoting *Silkwood*, 464 U.S. 238, 255, 104 S. Ct. 615, 625 (1984)). The *Haslip* Court focused on the traditional common law approach allowing the amount of the award to be determined by a jury "instructed to consider the gravity of the wrong and the need to deter similar wrongful conduct." *Id.* at 15, 111 S. Ct. at 1042. The jury's determination, according to the *Haslip* Court, was then reviewed by the trial and appellate courts to ensure reasonability. *Id.* The Court noted that the common law application of punitive damages is not unconstitutional per se and that the United States Supreme Court has on many occasions endorsed the practice. *Id.* at 16–17, 111 S. Ct. at 1042–43; *see, e.g., Standard Oil Co. of Ind. v. Missouri*, 224 U.S. 270, 285, 32 S. Ct. 406, 411 (1912) ("Nor, from a Federal standpoint, is there any invalidity in the judgment because there was no statute fixing a maximum penalty, no rule for measuring damages, and no hearing . . . ."); *Barry v. Edmunds*, 116 U.S. 550, 565, 6 S. Ct. 501, 509 (1886) ("For nothing is better settled than that, in such cases as the present, and other actions for torts where no precise rule of law fixes the recoverable damages, it is the peculiar

function of the jury to determine the amount by their verdict."); *Mo. Pac. Ry. v. Humes*, 115 U.S. 512, 521, 6 S. Ct. 110, 113 (1885) ("The discretion of the jury in such cases in not controlled by any very definite rules; yet the wisdom of allowing such additional damages to be given is attested by the long continuance of the practice."). Further, the *Haslip* Court noted that every state and federal court that had considered the matter concluded that the common law method for assessing punitive damages does not in itself violate due process. *Haslip*, 499 U.S. at 17–18, 111 S. Ct. at 1043.

Focusing on the process that led to the award of punitive damages, the *Haslip* Court reasoned that the jury instructions in the case appropriately instructed the jury to use punitive damages to punish and deter the defendant and not use them to compensate the plaintiff for injury. *Id.* at 19, 111 S. Ct. at 1044. The *Haslip* Court also approved of Alabama's postverdict review process, which "ensures that punitive damages awards are not grossly out of proportion to the severity of the offense and ha[s] some understandable relationship to compensatory damages." *Id.* at 22, 111 S. Ct. at 1045. The Court cautioned that vesting either a judge or jury with unlimited discretion in setting punitive damages award could cause "extreme results that jar one's constitutional sensibilities." *Id.* at 18, 111 S. Ct. at 1043. At the same time, however, the Court declared that it was not interested in slicing and dicing punitive judgment awards into those comporting with constitutional requirements and which do not. *Id.* The focus of the Court was on procedural due process, not substantive due process.

Justice Kennedy concurred. He agreed with the Court that the historical approach should govern the outcome in the case. *Id.* at 40, 111 S. Ct. at 1055 (Kennedy, J., concurring). He reasoned that because a jury

only considers one case and the instructions on punitive damages are necessarily general, "nonuniformity cannot be equated with constitutional infirmity." *Id.* at 41, 111 S. Ct. at 1055. Yet, Justice Kennedy noted that "[a] verdict returned by a biased or prejudiced jury no doubt violates due process, and the extreme amount of an award compared to the actual damage inflicted can be some evidence of bias or prejudice in an appropriate case." *Id.*

The comparatively cautious approach to traditional due process doctrine on punitive damages embraced by the *Haslip* Court drew crossfire from Justices Scalia and O'Connor. Justice Scalia concurred in the judgment but repeated his view that the Due Process Clause is not implicated by a jury's exercise of discretion in the award of punitive damages. *Id.* at 24–40, 111 S. Ct. at 1046–54 (Scalia, J., concurring). Justice O'Connor filed a dissent. She wrote that the traditional instructions for punitive damages were "so fraught with uncertainty that they defy rational implementation." *Id.* at 43, 111 S. Ct. at 1056 (O'Connor, J., dissenting). Her void-for-vagueness approach applied both to instructions related to determining whether to impose punitive damages and the determination of the amount of punitive damages. *Id.* at 44–52, 111 S. Ct. at 1057–61. She also directly challenged Justice Scalia's historic approach to due process espoused in his concurrence; rather, Justice O'Connor emphasized that due process was not a fixed notion. *Id.* at 60, 111 S. Ct. at 1065.

She quoted with approval *Williams v. Illinois*, 399 U.S. 235, 90 S. Ct. 2018 (1970), where the court noted that

> neither the antiquity of a practice nor the fact of steadfast legislative and judicial adherence to it through the centuries insulates it from constitutional attack . . . .
>
>     . . . .

> . . . [N]ew cases expose old infirmities which apathy or absence of challenge has permitted to stand. But the constitutional imperatives . . . must have priority over the comfortable convenience of the status quo.

*Haslip*, 499 U.S. at 61, 111 S. Ct. 1065 (alteration in original) (quoting *Williams*, 399 U.S. at 239, 245, 90 S. Ct. at 2012, 2024). Among other things, Justice O'Connor noted the substantive growth of the tort of bad faith in what otherwise would have been considered actionable only as breach of contract and the growth in product liability and mass tort litigation. *Id.* at 62, 111 S. Ct. at 1066. According to Justice O'Connor, the explosion in the frequency and size of awards exposed the flaws in the common law system. *Id.*

Two years later, the United States Supreme Court considered the constitutionality of a punitive damages award in *TXO Production Corp. v. Alliance Resources Corp.*, 509 U.S. 443, 113 S. Ct. 2711 (1993). In TXO, the respondent claimed an oil and gas enterprise slandered title to certain lands where substantial oil reserves were believed to be present. *Id.* at 446–48, 113 S. Ct. at 2714–15. The jury awarded the plaintiff $19,000 in compensatory damages and $10 million in punitive damages. *Id.* at 446, 113 S. Ct. at 2714. A fractured Court affirmed the judgment.

Justice Stevens announced the plurality opinion, which was joined by Chief Justice Burger and Justice Blackmun, and was joined in part by Justice Kennedy. *Id.* Justice Stevens began his opinion by noting that the punitive damages award was 526 times the actual damages awarded by the jury. *Id.* at 453, 113 S. Ct. at 2718. Justice Stevens, however, rejected any "test" for excessiveness. *Id.* at 456–57, 113 S. Ct. at 2719–20. In particular, Justice Stevens eschewed an approach that relied solely on the ratio of actual damages to punitive damages. *Id.* Because of the potential harm if the defendant's scheme had succeeded, Justice Stevens

noted that the disparity between the punitive award and the potential harm does not "jar one's constitutional sensibilities." *Id.* at 462, 113 S. Ct. at 2722 (quoting *Haslip*, 499 U.S. at 18, 111 S. Ct. at 1043 (majority opinion)). Justice Stevens noted that

> [t]he punitive damages award in this case is certainly large, but in light of the amount of money potentially at stake, the bad faith of petitioner, the fact that the scheme employed in this case was part of a larger pattern of fraud, trickery and deceit, and petitioner's wealth, we are not persuaded that the award was so "grossly excessive" as to be beyond the power of the State to allow.

*Id.* at 462, 113 S. Ct. at 2722–23.

Justice Stevens further found that the attack on the jury instruction, which emphasized the wealth of the defendant, was not preserved for review and rejected the notion that the procedure followed was unconstitutionally vague. *Id.* at 463–65, 113 S. Ct. at 2723–24.

Justice Kennedy concurred in part and concurred in the judgment. *Id.* at 466, 113 S. Ct. at 2724 (Kennedy, J., concurring in part and concurring in the judgment). Justice Kennedy rejected the various tests posed by the parties but also believed that the plurality's general focus on "reasonableness" was a significant improvement. *Id.* On the other hand, Justice Kennedy emphasized that a more manageable constitutional inquiry does not focus on the amount of money a jury awards but on its reason(s) for doing so. *Id.* at 467, 113 S. Ct. at 2725. According to Justice Kennedy, "The Constitution identifies no particular multiple of compensatory damages as an acceptable limit for punitive awards; it does not concern itself with dollar amounts, ratios, or the quirks of juries in specific jurisdictions." *Id.* While Justice Kennedy noted that the size of the award may be one indication it resulted from bias or prejudice, "that is not the sole, or even necessarily the most important, sign." *Id.* Justice

Kennedy stated that other objective indicia, as well as direct evidence, are helpful in determining "whether a jury stripped a party of its property in an arbitrary way and not in accordance with the standards of rationality and fairness the Constitution requires." *Id.*

Justice Kennedy then proceeded to consider the merits of the attack on the punitive damage award. Characterizing the case as "close and difficult," Justice Kennedy determined that the award should be upheld. *Id.* at 468, 113 S. Ct. at 2725. Echoing the Supreme Court of West Virginia, Justice Kennedy noted that the evidence demonstrated intentional misconduct by officers of the defendant "through a 'pattern and practice of fraud, trickery and deceit' and employed 'unsavory and malicious practices.' " *Id.* at 469, 113 S. Ct. at 2726 (quoting *TXO Prod. Corp. v. Alliance Res. Corp.*, 419 S.E.2d 870, 880, 890 (W. Va. 1992)). Further, Justice Kennedy found that the record showed "a pattern and practice [by petitioner] to defraud and coerce those in positions of unequal bargaining power." *Id.* Under the circumstances, Justice Kennedy found it probable "that the jury's verdict was motivated by legitimate concern for punishing and deterring [the petitioner], rather than by bias, passion, and prejudice." *Id.*

Justice Scalia, joined by Justice Thomas, concurred in the judgment. *Id.* at 470, 113 S. Ct. at 2726 (Scalia, J., concurring in the judgment). Justice Scalia reprised his view that "traditional American practice governing punitive damages requires no more" than instructions on the purposes of punitive damages and a review for reasonableness. *Id.* While Justice Scalia did not join the plurality opinion, he declared it valuable because the great majority of due process challenges could be disposed of simply with the observation "this is no worse than *TXO*." *Id.* at 472, 113 S. Ct. at 2727.

Justice O'Connor, joined by Justice White and joined in part by Justice Souter, dissented. *Id.* at 472, 113 S. Ct. at 2728 (O'Connor, J., dissenting). Justice O'Connor rejected the approach of the plurality as providing "no course at all." *Id.* at 480, 113 S. Ct. at 2731. Instead, she argued that the Court should adopt a regime of objective factors such as "the relationship between the punitive damages award and compensatory damages, awards of punitive damages upheld against other defendants in the same jurisdiction, awards upheld for similar torts in other jurisdictions, and legislatively designated penalties for similar misconduct" *Id.* at 481, 113 S. Ct. at 2732. Applying such objective factors to the facts of the case, Justice O'Connor concluded that the punitive damage award in the case was so excessive as to violate due process. *Id.* at 495, 113 S. Ct. at 2739.

A few years later, the Supreme Court decided *Honda Motor Co. v. Oberg*, 512 U.S. 415, 114 S. Ct. 2331 (1994). In *Oberg*, the plaintiff claimed that Honda's three-wheeled all-terrain vehicles were inherently unreasonably and defectively designed and that such flaws caused him severe and permanent injuries. *Id.* at 418, 114 S. Ct. at 2334. A jury awarded him $919,390.39 in compensatory damages, which were reduced to $735,512.31 because the plaintiff was found to be twenty percent at fault. *Id.* The jury further awarded the plaintiff $5 million in punitive damages. *Id.* The defendant challenged the punitive damage verdict for excessiveness and because, under the Oregon Constitution, courts lacked the power to correct an excessive jury verdict. *Id.*

In an opinion written by Justice Stevens, the *Oberg* Court considered the validity of a provision of the Oregon Constitution prohibiting judicial review of a punitive damages verdict unless the court "can affirmatively say there is no evidence to support the verdict." *Id.*

(quoting Or. Const. art. 7, § 3). The Court held that the limitation on judicial review of the verdict of a jury violated procedural due process rights guaranteed by the Fourteenth Amendment. *Id.* at 432, 114 S. Ct. at 2341.

The *Oberg* Court noted that recent U.S. Supreme Court cases recognized a substantive limit on the size of punitive damages awards. *Id.* at 420, 114 S. Ct. at 2335. Further, the *Oberg* Court emphasized that judicial review of jury verdicts awarding punitive damages was well established at English common law and in American common law cases. *Id.* at 421–24, 114 S. Ct. at 2335–37. According to the *Oberg* majority, the common law practice, the procedures of the states, the strong presumption of judicial review, and "elementary considerations of justice" all support the conclusion that the determination of the amount of punitive damages cannot be subject to the unreviewable discretion of the jury. *Id.* at 434–35, 114 S. Ct. at 2342.

Justice Scalia concurred. *Id.* at 435, 114 S. Ct. at 2342 (Scalia, J., concurring). He agreed with the Court based on his view that the unusual Oregon constitutional provision eliminated the traditional procedure for enforcing state prescribed limits on punitive damages. *Id.* at 436, 114 S. Ct. at 2342–43.

Justice Ginsburg, joined by Chief Justice Rehnquist, dissented. *Id.* at 436, 114 S. Ct. at 2343 (Ginsburg, J., dissenting). She reasoned that Oregon law guides and limits the exercise of jury discretion by reversing verdicts with punitive damages if the trial was infected with reversible error, the jury was improperly instructed on punitive damages, or there was no evidence to support the verdict. *Id.*

2. *High water mark of substantive due process review of punitive damages:* Gore *and* Campbell. Although application of the standard was

quite generous, *TXO* unmistakably stood for the proposition that there were, in fact, substantive due process limitations on the size of punitive damages awards. In two seminal cases where large punitive damages were awarded by juries in cases involving solely economic harms, the United States Supreme Court held that the Due Process Clause of the United States Constitution imposed limits on the amount of punitive damages that a jury could award. *See Campbell*, 538 U.S. 408, 123 S. Ct. 1513; *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 575, 116 S. Ct. 1589, 1598–99 (1996).

In *Gore*, an automobile dealer failed to disclose that a vehicle had been repainted after being damaged prior to delivery. 517 U.S. at 563, 116 S. Ct. at 1593. An Alabama jury awarded the plaintiff $4000 in compensatory damages and $4 million in punitive damages. *Id.* at 565, 116 S. Ct. at 1593–94. The Alabama Supreme Court reduced the punitive damages to $2 million, thus awarding punitive damages 550 times the amount of compensatory damages. *Id.* at 567, 116 S. Ct. at 1595.

Meanwhile, in *Campbell*, an insured brought an action against an insurer for bad-faith failure to settle a claim. 538 U.S. at 414, 123 S. Ct. at 1518. A jury awarded compensatory damages of $2.6 million, which the trial court reduced to $1 million, and punitive damages of $145 million, thus establishing a ratio of punitive damages to compensatory damages of 145:1. *Id.* at 415, 123 S. Ct. at 1519. In both cases, a majority of the court found the punitive damages award "grossly excessive" under substantive due process analysis, vacated the judgments, and remanded the cases to the state courts. *Id.* at 417, 429, 123 S. Ct. at 1520, 1526; *Gore*, 517 U.S. at 574–75, 116 S. Ct. at 1598.

In an opinion by Justice Stevens, the *Gore* Court built on language in *TXO* indicating that grossly excessive punitive damages awards violate

due process. Yet, the *Gore* Court emphasized that "States necessarily have considerable flexibility in determining the level of punitive damages that they will allow in different classes of cases." 517 U.S. at 568, 116 S. Ct. at 1595. Justice Stevens wrote that courts considering whether punitive damages were grossly excessive should consider as guideposts the degree of reprehensibility, the disparity between actual or potential harm, and the relationship, if any, between punitive damages and civil penalties. *Id.* at 574–75, 116 S. Ct. at 1598–99.

The *Gore* Court noted that reprehensibility was "[p]erhaps the most important indicium of the reasonableness of a punitive damages award." *Id.* at 575, 116 S. Ct. at 1599. By way of example, the majority emphasized that the "trickery and deceit" in *TXO* were more reprehensible than negligence. *Id.* at 576, 116 S. Ct. at 1599. And, in this case, unlike *Haslip* and *TXO*, "no deliberate false statements, acts of affirmative misconduct, or concealment of evidence of improper motive" were present. *Id.* at 579, 116 S. Ct. at 1601.

On the question of ratio of punitive damages to compensatory damages, the *Gore* Court was careful to emphasize that a mathematical formula could not be applied to all cases. *Id.* at 582, 116 S. Ct. at 1602. Nonetheless, the *Gore* Court noted that "[a] general concer[n] of reasonableness . . . properly enter[s] into the constitutional calculus." *Id.* at 583, 116 S. Ct. at 1602 (alterations in original) (quoting *TXO*, 509 U.S. at 458, 113 S. Ct. at 2720 (plurality opinion)).

On the third criterion of sanctions for comparable conduct, the *Gore* Court observed that the $2 million in punitive damages far exceeded permissible fines for the same conduct in Alabama. *Id.* at 583–84, 116 S. Ct. at 1603. The *Gore* Court stated that the punitive sanctions in this case

were not necessary to deter misconduct as less drastic remedies could meet that goal. *Id.* at 584–85, 116 S. Ct. at 1603–04.

Justice Breyer, joined by Justices O'Connor and Souter, concurred. *Id.* at 586, 116 S. Ct. at 1604 (Breyer, J., concurring). According to Justice Breyer, a jury verdict on punitive damages that was properly instructed was entitled to a strong presumption of validity. *Id.* at 586–87, 116 S. Ct. at 1604. In explaining how the presumption was overcome, Justice Breyer concluded that the Alabama legal standards were insufficiently precise to provide fair notice. *Id.* at 588, 116 S. Ct. at 1605. Second, Justice Breyer noted the severe disproportionality between the award and the legitimate punitive damages objectives. *Id.* at 596, 116 S. Ct. at 1609. For Justice Breyer, these two reasons, together, were sufficient to overcome the presumption of constitutionality behind a punitive damages award. *Id.* at 597, 116 S. Ct. at 1609.

Justice Scalia, joined by Justice Thomas dissented. *Id.* at 598, 116 S. Ct. at 1610 (Scalia, J., dissenting). He again stated his position that the Court's constitutional jurisprudence was an unjustified incursion into the province of state government. *Id.* Further, Justice Scalia stated that the Court's doctrine is not only mistaken but also insusceptible of principled application. *Id.* at 599, 116 S. Ct. at 1610. As a result, Justice Scalia wrote he did not feel bound by the doctrine of stare decisis. *Id.*

Justice Ginsburg, joined by Chief Justice Rehnquist, also dissented. *Id.* at 607, 116 S. Ct. at 1614 (Ginsburg, J., dissenting). Justice Ginsburg, like Justice Scalia, believed the Court unnecessarily and "unwisely venture[d] into territory traditional within the States' domain." *Id.* She noted that property interests were traditionally within the state's domain and that although the Alabama Supreme Court could have shown its work

more visibly, its judgment was entitled to respect. *Id.* at 611, 116 S. Ct. at 1616.

After the Supreme Court announced its decision in *Gore*, the case was remanded to the Supreme Court of Alabama for further proceedings. The Alabama Supreme Court declined to follow the Supreme Court's suggestion that punitive damages in the case over four times the compensatory damages might be excessive and instead awarded on remand punitive damages at a ratio of 12.5:1. *BMW of N. Am., Inc. v. Gore,* 701 So. 2d 507, 515 (Ala. 1997). The defendant did not seek further review of the judgment by the Supreme Court. *See* N. William Hines, *Marching to a Different Drummer: Are Lower Courts Faithfully Implementing the Evolving Due Process Guideposts to Catch and Correct Excessive Punitive Damages Awards?*, 62 Cath. U. L. Rev. 371, 374 (2012).

In *Campbell*, the Supreme Court elaborated on the framework developed in *Gore* in an opinion by Justice Kennedy. Here, the Supreme Court considered an insurance bad-faith claim where the plaintiff received a jury award of $2.6 million in compensatory damages and $145 million in punitive damages. *Campbell*, 538 U.S. at 415, 123 S. Ct. at 1519. The Utah courts reduced the compensatory damages to $1 million in compensatory damages. *Id.*

The *Campbell* Court repeated *Gore*'s declaration that reprehensibility is "the most important indicium of the reasonableness of a punitive damage award." *Id.* at 419, 123 S. Ct. at 1521 (quoting *Gore,* 517 U.S. at 575, 116 S. Ct. at 1599 (majority opinion)). In its analysis, the *Campbell* Court identified five relevant factors: (1) whether "the harm caused was physical as opposed to economic"; (2) whether "the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others"; (3) whether "the target of the conduct had financial

vulnerability"; (4) whether "the conduct involved repeated actions or was an isolated incident"; and (5) whether the conduct "was the result of intentional malice, trickery, or deceit, or mere accident." *Id.* at 419, 123 S. Ct. at 1521. We can infer from the *Campbell* Court that while the presence of multiple reprehensibility factors helps uphold a punitive damage award, one dominant factor can be sufficient to sustain an award. *Id.* ("The existence of any one of these factors weighing in favor of a plaintiff may not be sufficient to sustain a punitive damages award; and the absence of all of them renders an award suspect.") Further, the absence of all factors is not necessarily disqualifying but renders any punitive damages award suspect. *Id.*

Applying these factors, the *Campbell* Court noted that State Farm's handling of the underlying claim "merits no praise." *Id.* State Farm altered company records, disregarded the overwhelming likelihood of liability, and disregarded the near certainty that, if taken to trial, the judgment would be in excess of policy limits. *Id.* Further, State Farm at first assured the Campbells their assets would be safe from any verdict and then advised them to sell the house. *Id.* Based on its review of the record, the *Campbell* Court concluded that the jury punished State Farm for conduct dissimilar to that suffered by the plaintiff. *Id.* at 419–20, 123 S. Ct. at 1521. As pointed out by the *Campbell* Court, an individual or business cannot be punished for being unsavory. *Id.* at 423, 123 S. Ct. at 1523. The *Campbell* Court finally noted that there was no evidence that State Farm engaged in repeated conduct similar to that which the plaintiffs received. *Id.*

Regarding the second *Gore* factor, the *Campbell* Court stated that "few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process." *Id.* at 425, 123 S. Ct. at 1524. Similarly, the majority in *Campbell* noted

that "[s]ingle-digit multipliers are more likely to comport with due process, while still achieving the State's goal of deterrence and retribution, than awards with ratios in [the] range of 500 to 1." *Id.* Yet, as in *Gore*, the *Campbell* Court refused to establish "rigid benchmarks." *Id.* In addition, the majority in *Campbell* repeated the theme of earlier cases, reaffirming the broad power of states to set their own punitive punishments, as long as they fit within broader constitutional bounds. *Id.* at 421, 123 S. Ct. at 1522. Finally, the *Campbell* Court recognized that "ratios greater than those we have previously upheld may comport with due process where 'a particularly egregious act has resulted in only a small amount of economic damages.'" *Id.* at 425, 123 S. Ct. at 1524 (quoting *Gore*, 517 U.S. at 582, 116 S. Ct. at 1602).

On the third *Gore* guidepost, the *Campbell* Court noted that the availability of criminal sanctions could be a factor in considering the amount of punitive damages. *Id.* at 428, 116 S. Ct. at 1526. But punitive damages, according to the majority in *Campbell*, were not a substitute for criminal processes that have more trial protections and higher standards of proof. *Id.*

Justices Scalia, Thomas, and Ginsburg all filed dissenting opinions, repeating their established and emphatic views that the United States Supreme Court should stay out of state court judgments regarding punitive damages, provided the juries receive adequate instruction and the judgments are subject to judicial review under state law standards. *Id.* at 429, 116 S. Ct. at 1526 (Scalia, J., dissenting); *id.* at 429–30, 116 S. Ct. at 1526 (Thomas, J., dissenting); *id.* at 430–39, 116 S. Ct. at 1527–31 (Ginsburg, J., dissenting).

On remand, the Utah Supreme Court reduced the punitive damages award to $9 million, an award which had a 9 to 1 ratio to compensatory

damages. *Campbell v. State Farm Mut. Auto. Ins.*, 98 P.3d 409, 413 (Utah 2004). State Farm sought certiorari again, which the Supreme Court denied. *State Farm Mut. Auto Ins. v. Campbell*, 543 U.S. 874 (2004) (mem.). Thus, on the two major state court cases in which the Supreme Court engaged in substantive due process cases, punitive damages at a ratio of 12.5 to 1 and 9 to 1 were the ultimate results of the state court litigation.

3. *Return to procedural due process:* Philip Morris USA v. Williams. In 2007, the United States Supreme Court reentered the punitive damages arena in *Philip Morris USA v. Williams* (*Williams II*), 549 U.S. 346, 127 S. Ct. 1057 (2007). In *Williams v. Philip Morris Inc.*, the Oregon Court of Appeals considered a case in which a plaintiff widow and an estate brought an action of negligence and deceit against Philip Morris in connection with the death of Jesse Williams, a heavy cigarette smoker. 48 P.3d 824, 828 (Or. Ct. App.), *adhered to on reconsideration*, 51 P.3d 670, 673 (Or. Ct. App. 2002). The Oregon appellate court upheld the jury's verdict in favor of the plaintiff and its award of $821,000 in compensatory damages and $79.5 million in punitive damages. *Id.* at 843.

At first, the United States Supreme Court simply remanded to the Oregon state courts in light of *Campbell*. *See Philip Morris USA Inc. v. Williams* (*Williams I*), 540 U.S. 801, 124 S. Ct. 56 (2003) (mem.). On remand, the Oregon Supreme Court upheld the verdict and the Supreme Court granted certiorari in the case for the second time. *Williams v. Philip Morris Inc.*, 127 P.3d 1165, 1182 (Or. 2006), *vacated sub nom. Williams II*, 549 U.S. 346, 127 S. Ct. 1057, *and adhered to on reconsideration*, 176 P.3d 1255, 1264 (Or. 2008).

On the second appeal, Philip Morris argued that the Oregon trial court erred in failing to instruct the jury that it could not punish the company for injury to persons not before the court, a procedural due

process argument. *Williams II*, 549 U.S. at 350–51, 127 S. Ct. at 1061. In addition, Philip Morris claimed that the punitive damages verdict of $79.5 million was "grossly excessive," a substantive due process challenge. *Id.* at 351–52, 127 S. Ct. at 1061–62. In an opinion by Justice Breyer, the Supreme Court considered only the first procedural due process question regarding jury instructions raised by Philip Morris. *Id.* at 352, 127 S. Ct. at 1062.

The *Williams II* Court reasoned that harm to others may not be used to punish a defendant with punitive damages, noting that a defendant may not be able to show in a trial that the nonparty knew that smoking was dangerous or did not rely on statements from the manufacturer. *Id.* at 353–54, 127 S. Ct. at 1063. Further, questions regarding nonparties remain speculative, including how many are there, how they were injured, how the injury occurred, and more. *Id.* at 354, 127 S. Ct. at 1063. The *Williams II* Court emphasized, however, that harm to others could be used as a factor in determining the reprehensibility of conduct. *Id.* at 355, 127 S. Ct. at 1063–64. As can be seen, the argument in the majority opinion in *Williams II* was based on procedural due process and not the substantive due process theory that the punitive damages were grossly excessive. *Id.* at 357–58, 127 S. Ct. at 1065.

Justice Stevens dissented. *Id.* at 358, 127 S. Ct. at 1065 (Stevens, J., dissenting). He believed the Oregon Supreme Court correctly applied the law and saw no reason why harm to others could not be taken into consideration in assessing punitive damages. *Id.* at 358, 127 S. Ct. at 1066. Justice Thomas also dissented, expressing his view that the Constitution does not constrain the size of punitive damage verdicts. *Id.* at 361, 127 S. Ct. at 1067 (Thomas, J., dissenting).

Justice Ginsburg, joined by Justices Scalia and Thomas, filed a third dissent. *Id.* at 362, 127 S. Ct. at 1068 (Ginsburg, J., dissenting). She noted that the majority would allow the use of harm to others to support reprehensibility analysis and that the Oregon Supreme Court did not rule otherwise. *Id.* She further noted that the issue decided by the majority was not preserved in the Oregon state courts. *Id.* at 362–63, 127 S. Ct. at 1068. Justice Ginsburg stated she would affirm the verdict of the Oregon Supreme Court in light of the abundant evidence of "the potential harm [Philip Morris'] conduct could have caused. *Id.* at 363–74, 127 S. Ct. at 1068–69.

On remand, the Oregon Supreme Court's ruling was surprising. The Oregon Supreme Court held that although the trial court erred in rejecting Philip Morris's proposed instruction for the reasons outlined by the United States Supreme Court in *Williams II*, there were other errors in the proposed instruction that, under Oregon law, supported the rejection of the instruction by the trial court. *Williams*, 176 P.3d at 1257. The Oregon Supreme Court reinstated the verdict against Philip Morris, including the $79.5 million punitive damages award. *Id.* at 1263–64.

Philip Morris again sought certiorari from the United States Supreme Court on two issues: (1) whether the Oregon Supreme Court could avoid the holding in *Williams II* by raising an independent state ground on remand for the first time in litigation, a state law procedural bar that is neither firmly established nor regularly followed; and (2) whether a punitive damage award that is ninety-seven times the compensatory damages could be upheld. Petition for Writ of Certiorari at i, *Philip Morris USA v. Williams*, 553 U.S. 1093 (2008) (No. 07-1216), 2008 WL 795148.

Interestingly, the Supreme Court granted certiorari on the first question but not the second; then, after oral argument, the Supreme Court dismissed the case on the ground that certiorari was improvidently granted. *Philip Morris USA Inc. v. Williams*, 556 U.S. 178, 129 S. Ct. 1436 (2009) (mem.) (per curiam); *see generally* Catherine M. Sharkey, *Federal Incursions and State Defiance: Punitive Damages in the Wake of* Philip Morris v. Williams, 46 Willamette L. Rev. 449 (2010).

4. *Summary of evolving Supreme Court precedent.* As is demonstrated above, the United States Supreme Court opinions on punitive damages present a tapestry of different colors. Traditionally, the Supreme Court has shown great deference to state court processes and has not been inclined to intervene. As the Supreme Court edged toward procedural due process review, it acknowledges the importance of the federalism concerns. Even when the Supreme Court crossed the Rubicon and applied substantive due process review of the amount of punitive damages verdicts, the Court continued to repeatedly employ language of respect for state court processes.

The emphasis on state court processes accomplished two purposes. First, respectful language regarding state court proceedings tended to make the Supreme Court's doctrine less revolutionary. Second, it may have been designed to attract maximum support on a highly divided court. In any event, as can be seen in the remands discussed above to Alabama, Utah, and Oregon, the respect for state court processes tended to take the edge off dicta in *Gore* and *Campbell* that might otherwise be read as establishing strong presumptions in favor of punitive damages awards with relatively low ratios of punitive to compensatory damages.

The Supreme Court has also sent mixed messages on punitive damages. *TXO* permitted a 526 to 1 punitive damages to compensatory

damages ratio to stand in a case involving solely economic damages. *TXO* has been cited neutrally, if not favorably, in subsequent Supreme Court cases. So in addition to the mitigating effects of federalism, the Supreme Court has explicitly embraced at least one dramatic outlier to its approach in *Gore/Campbell.*

Further, the above narrative demonstrates that the *Gore/Campbell* approach remains highly controversial among members of the Supreme Court. This may be in part because of Justice O'Connor's very direct appeal to living constitutionalism in support of *Gore/Campbell,* and Justice Scalia's equally passionate appeal to constitutional history. Given the changing makeup of the court, there may be some question as to the continued viability of *Gore/Campbell.* It is quite conceivable that the Supreme Court will choose to avoid review of punitive damages under substantive due process, as it did in the *Williams* cluster of cases to avoid yet another go around on the issue. The ultimate effect is that state courts may have considerable breathing room given the multiple strands of language in the existing caselaw.

**D. Iowa Supreme Court Precedent Involving Due Process Limitations on Punitive Damages.** We have had many cases dealing with the excessiveness of common law punitive damages.[5] In an early

---

[5]We have found only two cases that deal with the constitutionality of a punitive damages award under due process. In *Wolf v. Wolf,* 690 N.W.2d 887 (Iowa 2005), we rejected a due process challenge on an award of $25,000 in a child custody dispute where the plaintiff waived all damages except $1. *Id.* at 895–96. In *Spaur v. Owens-Corning Fiberglas Corp.,* 510 N.W.2d 854 (Iowa 1994), an asbestos manufacturer challenged an award of punitive damages on the ground that there were multiple punitive damage awards in multiple actions across the country. *Id.* at 865. We rejected that claim. *Id.* at 866. Finally, in *Ezzone v. Riccardi,* 525 N.W.2d 388 (Iowa 1994), we concluded that the due process decisions of the United States Supreme Court required appellate review of the amount of punitive damages. *Id.* at 398–99. We have not had occasion to consider an independent due process constitutional claim under article I, section 9 of the Iowa Constitution.

case, *Saunders v. Mullen*, 66 Iowa 728, 24 N.W. 529 (1885), we held that where actual damages sustained by one whose restaurant was unlawfully closed by an illegal levy of attachment could not have exceeded $50, an award of exemplary damages of $650 was excessive. *Id.* at 729, 24 N.W. at 529–30. While the *Saunders* court recognized that the amount of punitive damages was in the discretion of the jury, it stated that such discretion was not unlimited. *Id.* at 729, 24 N.W. 529. The *Saunders* court stated that an appellate court should not interfere "unless the conclusion is irresistible that the amount allowed is so great as to evince prejudice on the part of the jury." *Id.* at 729, 24 N.W. 529–30;[6] *see McCarthy v. J.P. Cullen & Son Corp.*, 199 N.W.2d 362, 368–70 (Iowa 1972) (holding a judgment of punitive damages turns "more or less" on acts peculiar to each case, "rests largely in discretion of the jury," and must be reasonably related to actual damages, but rejecting a numeric formula).

Later Iowa cases make clear, however, that *Saunders* did not establish some kind of mathematical limit to punitive damages. For example, in *Ryan v. Arneson*, 422 N.W.2d 491 (Iowa 1988), the court considered a white-hot controversy involving allegations that a party wrongfully attached logs that were cut down on disputed property. *Id.* at 492. The trial court awarded the injured party $120 in actual damages and $18,600 in punitive damages. *Id.* at 493. A question on appeal was whether the punitive damages award was so excessive as to demonstrate prejudice and passion of the jury. *Id.* at 495.

The *Ryan* court upheld the punitive damages award that was 155 times the compensatory damages. *Id.* at 497. The *Ryan* court declared

---

[6]The *Saunders* case was cited by the United States Supreme Court in *Gore*, 517 U.S. at 580 n.32, 116 S. Ct. at 1601 n.32, and in the dissent in *TXO*, 509 U.S. at 478 n.3, 113 S. Ct. at 2731 n.3 (O'Connor, J., dissenting).

that the primary focus in a review of a punitive damage award was the relationship between the award and the wrongful conduct of an offending party. *Id.* at 496. The *Ryan* court noted that "[a]n inflexible mathematical ratio which focuses on the plaintiff's injuries rather than the wrongful acts of the defendant fails to accomplish the policy objectives and punishment and deterrence." *Id.* The *Ryan* court emphasized that in determining whether punitive damages are so excessive that they demonstrate passion and prejudice on the part of the jury, "we will consider whether the punitive damage award is reasonably related to the malicious conduct of the defendant which resulted in actual injury or damage to the plaintiff." *Id.*

Up until 1994, we declined to order remittitur in cases involving claims of excessive punitive damages. *See Spaur v. Owens-Corning Fiberglas Corp.*, 510 N.W.2d 854, 869–70 (Iowa 1994). In *Ezzone v. Riccardi*, 525 N.W.2d 388 (Iowa 1994), however, we recognized that the United States Supreme Court in *Oberg* decided it was a denial of due process for a state to allow punitive damages without according appellate review of the appropriateness of the amount. *Id.* at 399. Although no constitutional issue was presented in *Ezzone*, the court determined that it would follow the approach required in *Oberg*. The *Ezzone* court declared that punitive damage awards will be tested

> with a view of the extent and nature of the outrageous conduct, the amount necessary for future deterrence, and with deference to the relationship between the punitive award and plaintiff's injury, as reflected in any award for compensatory damages. In addition to these traditional factors, we shall consider all circumstances surrounding the conduct and relationship between the parties.

*Id.*

Applying these principles, the *Ezzone* court ordered a substantial remittitur of punitive damages awarded in a case involving verdicts against defendants on interference with contract, conversion, and breach of confidential relations. The jury awarded compensatory damages totaling $650,000 per plaintiff and the punitive damages totaling $1,260,572. *Id.* at 392–93. The court ultimately entered a smaller award after the parties agreed some of the jury-awarded compensatory damages were duplicative. *Id.* The *Ezzone* court, however, although it found substantial evidence to support the verdict, did not think much of the plaintiffs' case. *Id.* at 391 (noting the jury subscribed to plaintiffs' factual contentions, which clearly would have been rejected by many fact finders). Based on its review of the record, the *Ezzone* court entered remittitur reducing the punitive damages to $118,500. *Id.* at 399.

After *Ezzone,* we considered the validity of a $15 million punitive damage award in a slander case where the plaintiff suffered only $4000 in actual damages. *Wilson v. IBP*, 558 N.W.2d 132, 136 (Iowa 1996) (en banc). The record in *Wilson* showed that employees of IBP engaged in a malicious course of conduct regarding injured workers, sought to manipulate and repeatedly interfered with their medical treatment, and manipulated work records that may have resulted in falsification of OSHA records. *Id.* at 148. We also considered the wealth of the defendant as a factor. *Id.* Citing *Gore*, *Haslip*, *Spaur*, *Ryan*, and *Ezzone*, we held that the $15 million in punitive damages assessed against IBP was excessive. *Id.* We concluded, however, that an award of $2 million was supported by the record. *Id.* The ratio of punitive damages to actual damages in *Wilson* was 500 to 1.

Finally, in *Wolf v. Wolf*, we considered a $25,000 punitive damages award in a child custody dispute where the plaintiff waived all

compensatory damages except $1. 690 N.W.2d 887, 895 (Iowa 2005). Engaging in a *Gore/Campbell*-type analysis, we concluded that the punitive damages in that case were not excessive. We concluded that the conduct of the defendant involved intentional malice, trickery, and deceit; that the actual harm to the plaintiff exceeded the $1 awarded by the court; and that the Iowa legislature had provided for a jail term of up to thirty days for violation of the court decree. *Id.* at 895–96.

Although there are a considerable number of cases, Iowa caselaw on punitive damages is not highly developed and is often quite conclusory. In an application of federal law after *Gore* was decided, we upheld a very large award of punitive damages in *Wilson.* In the case before us, although Thornton cites article I, section 9 of the Iowa Constitution, his argument is based on the evolving federal caselaw. As a result, on the state due process claim, we accept, for purposes of this case, the federal framework, reserving the right to apply that framework in a more stringent fashion than the federal caselaw. *See, e.g., State v. Tyler*, 830 N.W.2d 288, 291 (Iowa 2013).

**E. Positions of Parties.**

1. *Thornton.* Thornton maintains that the $6.75 million in punitive damages in a case involving $284,000 in compensatory damages fully comports with due process. He opens his argument by citing two more recent Iowa Supreme Court cases: *Wilson*, 558 N.W.2d at 148, and *Gibson v. ITT Hartford Insurance*, 621 N.W.2d 388, 398–99 (Iowa 2001) (en banc). He claims that these two cases demonstrate that a ratio of 17 to 1 in this case does not offend due process under the Iowa Constitution.

Thornton next turns to the question of whether the award of punitive damages offends the Due Process Clause of the United States Constitution. He notes that in *Campbell,* the United States Supreme Court emphasized

that it declined to impose a bright-line ratio that a punitive damage award cannot exceed. 538 U.S. at 424, 123 S. Ct. at 1524. Further, Thornton argues that the facts of this case are more egregious than those in *Campbell.* Thornton asserts he was a financially vulnerable quadriplegic who was the victim of targeted bad faith for more than half a decade by American Interstate.

Thornton proceeds to apply the five-factor reprehensibility test identified in *Campbell. See id.* at 419, 123 S. Ct. at 1521. He asserts that the harm to him was both physical and economic. He claims the refusal to provide wage information, the threats to delay payment, and testimony from American Interstate's claims manager that she would provide a wheelchair when "ordered" to do so demonstrated indifference to Thornton's health and safety. Thornton further argued that he was financially vulnerable during the period of time when American Interstate's bad faith occurred, as he was living on workers' compensation benefits and social security disability payments. According to Thornton, American Interstate engaged in repeated misconduct by denial of several petitions related to workers' compensation benefits, threats to delay the process, and difficulties getting his needs met. Finally, Thornton claims that the bad-faith actions of American Interstate were intentional, further noting that American Interstate still asserts that it did nothing wrong in this case.

On the question of disparity between actual or potential harm, Thornton argued that if American Interstate's bad faith had continued, the potential harm to Thornton and other injured workers would be far greater than actually incurred. Thornton then turns to multiplier analysis, noting that the United States Supreme Court upheld an award of $10 million in punitive damages in a case involving $19,000 in compensatory damages, or a ratio of 526 to 1. *See TXO,* 509 U.S. at 453, 113 S. Ct. at 2718

(plurality opinion). Thornton cites several other post-*Campbell* cases where courts have awarded punitive damages using double digit multipliers. *See Mathias v. Accor Econ. Lodging, Inc.*, 347 F.3d 672, 674 (7th Cir. 2003); *Nickerson v. Stonebridge Life Ins.*, 209 Cal. Rptr. 3d 690, 695 (Ct. App. 2016); *Bullock v. Philip Morris USA, Inc.*, 131 Cal. Rptr. 3d 382, 386 (Ct. App. 2011); *Phelps v. Louisville Water Co.*, 103 S.W.3d 46, 49 (Ky. 2003); *Seltzer v. Morton*, 154 P.3d 561, 614 (Mont. 2007); *Hamlin v. Hampton Lumber Mills, Inc.*, 246 P.3d 1121, 1123 (Or. 2011).

Finally, Thornton addresses the issue of civil versus criminal penalties. Thornton argues that civil penalties are not available for the bad-faith claims raised in this case, and thus the third factor is not applicable. In any event, under the Iowa case of *Wilson*, Thornton argues that the criteria for evaluating punitive damages does not include a comparison between civil penalties and the punitive damages awarded in the case. *See Wilson*, 558 N.W.2d at 142.

2. *American Interstate.* At the outset, American Interstate relies heavily on language in *Campbell*. American Interstate cites *Campbell*, which notes, "[I]n practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process." 538 U.S. at 425, 123 S. Ct. at 1524 (majority opinion). The *Campbell* Court further noted that "an award of more than four times the amount of compensatory damages might be close to the line of constitutional impropriety." *Id.*

American Interstate canvasses insurance bad-faith cases. It asserts that it could find no insurance bad-faith case involving "substantial compensatory damages" where the court upheld a ratio of punitive damages at or near 18 to 1. American Interstate did, however, cite a number of insurance bad-faith cases where punitive damages were

remitted to a ratio of 4 to 1. *See Buhmeyer v. Case New Holland, Inc.*, 446 F. Supp. 2d 1035, 1047–50 (S.D. Iowa 2006); *Arellano v. Priameria Life Ins.*, 332 P.3d 597, 605–06 (Ariz. Ct. App. 2014); *Amerigraphics, Inc. v. Mercury Cas. Co.*, 107 Cal. Rptr. 3d 307, 330 (Ct. App. 2010), *overruled on other grounds by Nickerson v. Stonebridge Life Ins.*, 371 P.3d 242, 250 n.2 (Cal. 2016); *Hall v. Farmers All. Mut. Ins.*, 179 P.3d 276, 286 (Idaho 2008); *Goddard v. Farmers Ins. Co. of Or.*, 179 P.3d 645, 667–71 (Or. 2008) (en banc).

On the issue of reprehensibility, American Interstate claims that the company made its decisions because it was confused by the unwillingness of plaintiffs' counsel to engage in meaningful settlement negotiations and was concerned that Thornton was not being offered what American Interstate believed were greater benefits than could be obtained through litigation. American Interstate also claims it was motivated to make sure Thornton was informed about vocational rehabilitation opportunities that were communicated to counsel and that the deputy workers' compensation commissioner was aware of benefits that were provided to Thornton.

While American Interstate recognizes that its motivations were not legally justified under the bad-faith standard, they do not demonstrate reprehensible conduct. Thornton continued to receive income replacement and medical benefits and, as a result, was not financially vulnerable. Its conduct, according to American Interstate, was a one-off incident, not repeated misconduct, and did not show intentional malice or trickery.

Turning to the ratio between compensatory and punitive damages, American Interstate begins its analysis by characterizing the $382,000 in

compensatory damages as "substantial" and therefore supporting a lesser ratio of punitive damages. *See Campbell*, 538 U.S. at 425, 123 S. Ct. 1513.

American Interstate then turns to bad-faith caselaw to support its position. For example, American Interstate notes that in *Goddard*, the court found the conduct of the insurance company as bad as any economic wrongdoing it could conceive, yet the court also reduced the ratio to 4 to 1. *See Goddard*, 179 P.3d at 670–71. Further, American Interstate cites *Buhmeyer*, where the federal court reduced a punitive damage award to 4 to 1 in a workers' compensation case in which the court found the defendant's conduct fell somewhere in the middle of the reprehensibility analysis. *See Buhmeyer*, 446 F. Supp. 2d at 1050. While American Interstate recognizes that some cases involve greater punitive damage ratios, they tend to be cases with smaller compensatory damage awards. *See Kennedy v. Supreme Forrest Prods., Inc.*, 295 F. Supp. 3d 113, 116 (D. Conn. 2017); *Saint Joseph Healthcare, Inc. v. Thomas*, 487 S.W.3d 864, 869 (Ky. 2016).

Finally, American Interstate notes that the level of civil penalties available for the misconduct in this case is zero. Under Iowa Code section 86.13 (2013), there is no penalty that could be awarded because American Interstate paid full benefits to Thornton throughout the workers' compensation litigation.

**F. De Novo Review of American Interstate's Bad-Faith Denial of PTD.**

1. *Introduction.* The United States Supreme Court has called for a searching de novo inquiry in punitive damage cases under the Federal Due Process Clause. As a result, it is necessary to canvass the record in this case in detail.

2. *Thornton's injuries.* The evidence at the second bad-faith trial showed that Thornton suffered a catastrophic injury as a result of the accident. It was undisputed that Thornton was paralyzed from the chest down and that he had no use of one hand and limited use of the other. He remained hospitalized for approximately four months after the accident.

Upon release from the hospital, Thornton was wheelchair bound. He required three hours of home health assistance each morning to prepare for the day. He would occasionally require assistance at other times of the day, which he obtained through calling either a family member or his home healthcare aide if she was available. If he had a problem and no one was available, he had to wait, something that occurred about fifteen times a year. Ultimately, he successfully learned to drive a specially equipped van which allowed him to travel some distance. By March 23, 2011, Thornton's physician, Dr. Rogge, advised American Interstate that Thornton had reached maximum medical improvement.

3. *American Interstate's treatment of file as PTD.* American Interstate concluded early on that Thornton was permanently and totally disabled. As early as July 7, 2009, Luann Miller, a claims manager for American Interstate initially assigned the file, stated that the file would be "a perm, total with lifetime exposure." She believed the injury was severe enough "to easily classify it as perm total."

American Interstate established reserves reflecting that Thornton was PTD. When American Interstate hired a lawyer, Cory Abbas, to assist them on the file, American Interstate told the lawyer that the company accepted permanent total exposure on the file. After review of the file, the lawyer advised the company on June 25, 2012, that "there currently do not seem to be many facts present that could be helpful in supporting a finding of less than permanent total disability." And again, prior to the

hearing before the workers' compensation commissioner, American Interstate's lawyer on March 11, 2013, told the client that "as originally evaluated, there is really no possible situation where claimant is not going to be found to be permanently and totally disabled in this matter." When asked at trial whether there was anyone at American Interstate who thought that Thornton would improve so much that he would actually not be permanently and totally disabled, Henry Lestage, Senior Vice President of Claims, replied, "No." Thornton, however, was never directly told that American Interstate considered his injuries to result in PTD.

4. *Collapse of settlement discussions.* In February 2012, Thornton, prior to engaging counsel, engaged in discussions with American Interstate about potential settlement. Thornton developed potential budgets and American Interstate flew in a financial consultant to present illustrations of potential structured settlement approaches. Thornton was told by the financial consultant that "this is probably the best deal you're going to get" and "if I was you, I'd probably take it." Thornton did not fully understand the proposals, however, and was unwilling to commit without consulting others.

Thornton ultimately hired attorney Tiernan Siems to assist him in workers' compensation matters. On May 24, 2012, Thornton filed a petition with the workers' compensation commissioner seeking a declaration that he was PTD. American Interstate denied that Thornton was PTD. As a result of scheduling issues, a planned mediation did not occur until October 25, 2012, the date the jury identified as marking the beginning of American Interstate's bad faith. Prior to the mediation, Abbas sent an email to Siems regarding mediation dates. In the email, he stated, "Probably the most important reason for your client to consider a closed file settlement vs. partial commutation is the fact that he would be getting

a lump-sum payment much sooner rather than later." Abbas noted "it could well be 2-3 years before a final award is entered (considering potential appeals to the Commissioner, and potentially much longer appeals to the Courts)." Abbas stated that the most compelling reason to reach a settlement is that "your client will get a lump sum potentially by the end of the year rather than 2-3 years down the road."

At the October 25 mediation, American Interstate made an offer that included payment to Thornton of a substantial lump-sum and the establishment of what American Interstate regarded as well-funded healthcare accounts to fund Thornton's ongoing medical needs. American Interstate, however, insisted on a closed file in which American Interstate's risk on the file for all workers' compensation benefits, including medical benefits, would be shifted to Thornton. Thornton, through his attorney Siems, insisted on an open file in which American Interstate would continue to provide medical benefits for life. Siems also demanded a lump sum of $1,160,000, an amount that American Interstate viewed as $400,000 in excess of any lump sum that would be available under workers' compensation.

At the mediation, Abbas urged settlement because it was preferable to contested litigation, which would take time to resolve. While statements or characterizations of counsel Siems at trial regarding those statements were not evidence, there is no question that the downside to Thornton of litigation delay was introduced into the discussion at the mediation conference by Abbas.

5. *Resistance to PTD after collapse of settlement.* After the failure of mediation, American Interstate decided to challenge whether Thornton was, in fact, PTD notwithstanding its knowledge of the facts, its internal

correspondence indicating the file was PTD, and its high level of reserves on the claim.

American Interstate took a number of steps to implement its new strategy. American Interstate requested and obtained an independent medical examination of Thornton. American Interstate deposed Thornton in the PTD proceeding, attempting to extract concessions on potential employability ("[S]ome day I would like to get a job. It's boring sitting around."). American Interstate also hired an expert, Phil Davis, to suggest that Thornton should explore potential vocational rehabilitation. But there were a number of problems.

First, American Interstate had shown no interest in vocational rehabilitation in the two-and-a-half years prior to the failed mediation. American Interstate as insurer would have a strong incentive to explore vocational training if it offered any prospect of success. As stated by Luann Miller, the claims manager responsible for the Thornton file, if the case for PTD was close, she would have started investigating the possibility. Yet, prior to the collapse of the settlement discussion on October 25, 2012, American Interstate showed no interest in vocational programs.

Second, after October 25, no effort was made to do a real vocational evaluation of Thornton. Such an evaluation would include, among other things, a review of Thornton's age, education, work experience, nature of injuries, and a study of the labor market near Thornton's home in Monona, Iowa. American Interstate simply did not arrange for a serious vocational evaluation but instead developed a very limited approach, suggesting through its vocational rehabilitation expert, Phil Davis, that some services theoretically might be available for Thornton to consider.

Third, while Davis testified that although there were specialized vocational programs that Thornton could perhaps explore, he did not declare that Thornton was not PTD. Indeed, Davis stated he "would have trouble" with the use of his report to suggest that Thornton was not PTD. Davis emphasized that he was simply pointing out possible avenues that Thornton might pursue, nothing more. Echoing the testimony of Luann Miller, vocational expert Ronald Schmidt testified at the bad-faith trial that the question of whether Thornton qualified as PTD was "not even a close call." According to Schmidt, there was "no doubt in [his] mind" that Thornton could not obtain suitable employment in Monona, Iowa.

Fourth, there was no clear release from Thornton's physician to engage in vocational rehabilitation. Prior to the PTD hearing before the deputy commissioner, when Abbas asked Thornton's physician, Dr. Rogge, about the possibility of him participating in vocational rehabilitation, Rogge responded, "no."

On March 11, 2013, Abbas sent an email to American Interstate stating that "as originally evaluated," "there is really no possible situation where claimant is not going to be permanently and totally disabled in this matter." The Abbas email resulted in a conference call involving higher management of American Interstate, including a Senior Vice President of Claims Henry Lestage. Abbas and Rodgers took the position that Thornton was PTD. Notwithstanding the Abbas recommendation and the view of the claims manager, Lestage made the decision to proceed with a scheduled workers' compensation hearing. Although at the first trial Lestage defended his decision, at the second trial he admitted that he made a mistake. According to Lestage, American Interstate was trying to resolve the case through settlement but he "was just shocked that that we could not even get a discussion about how to do that." Lestage admitted he "got

bullheaded" as a result and claimed he realized that "it would probably just have been easier and in Toby's better interest just to write the check."

6.  *PTD proceedings before the deputy commissioner.*  A hearing was held before a deputy commissioner on March 28, 2013.  At the hearing, Thornton was the only witness.  The parties submitted various exhibits to the deputy commissioner.

The deputy commissioner entered an order May 23, 2013.  In the order, the commissioner noted that "there is no real dispute as to how seriously Thornton was injured; only whether he retains some residual earning capacity."  The deputy commissioner was unpersuaded that Phil Davis' report was critical of Thornton for not contacting various services agencies, noting that Davis did not meet or speak with Thornton and did not specify what "retraining" and "competitive employment" meant.

The deputy commissioner explored the legal parameters of PTD, noting that permanent and total disability does not mean a state of absolute helplessness, but "wholly disables the employee from performing work that the employee's experience, training, education, intelligence, and physical capacities would otherwise permit the employee to perform."  *IBP, Inc. v. Burress*, 779 N.W.2d 210, 221 (Iowa 2010).   The deputy commissioner noted that the pertinent question was whether "there [are] jobs in the community that the employee can do for which the employee can realistically compete[.]"  *Second Injury Fund of Iowa v. Shank*, 516 N.W.2d 808, 815 (Iowa 1994).  The deputy commissioner noted that the question was "whether the person is capable of performing a sufficient quantity and quality of work [such] that an employer in a well-established branch of the labor market would employ the person on a continuing basis and pay the person sufficient wages to permit the person to be self-supporting."   *Tobin-Nichols v. Stacyville Cmty. Nursing Home*, Iowa

Workers' Comp. Comm'n No. 1222209, 2003 WL 22927701, at *1 (Dec. 9, 2003).  The deputy commissioner noted,

> [T]here is no showing of work he could actually perform in sufficient quality and quantity as to enable him to be self-supporting through his own wages.  Defendants impliedly concede this point by virtue of their demonstrated disinterest in offering rehabilitation services.

Applying the legal principles to the facts presented at the hearing,  the deputy commissioner declared, "[T]he decision in this case is clear and obvious: Toby Thornton is now subject to permanent total industrial disability . . . and entitled to benefits on that basis."   After the deputy industrial commissioner's ruling, Thornton filed a petition for partial commutation of his workers' compensation benefits on May 28, 2013.

American Interstate noted the deputy's statement regarding demonstrated disinterest in offering rehabilitation services.  It decided to attempt to repair the negative commentary by filing a motion for reconsideration on June 3, 2013, pointing to recent correspondence from American Interstate suggesting that Thornton could participate in various vocational programs.

The deputy commissioner entered a ruling on June 24.  The deputy commissioner modified the prior order by deleting references to defendant's failure to provide vocational rehabilitation services, but this did not affect the award.  The deputy commissioner declined to stay or dismiss the commutation proceedings pending any potential appeal.  Ultimately, American Interstate declined to appeal and the decision of the deputy industrial commissioner became final.

7.  *Partial commutation proceedings before the deputy commissioner.*  Thornton proceeded to pursue his partial commutation petition.   The deputy commissioner entered a favorable ruling on partial commutation

on May 16, 2014. Among other things, the deputy noted that it would be hard to imagine a clearer scenario where partial commutation should be granted. The deputy commissioner noted that Thornton and his brother Timothy sought the assistance of a reasonable investment group to assist in the management of the claimants funds. Further, the deputy noted,

> I find that there is minimal risk that claimant's funds will be significantly depleted through his stated investment plan. He has demonstrated a conservative investment approach and is not likely to lose a significant portion of the commuted funds in the conservative approach he testified he intends to pursue.

At all relevant times, American Interstate was aware that in cases like Thornton's, it would be in the claimant's best interest to obtain a partial commutation of his workers' compensation benefits. Luann Miller testified that she always thought that partial commutation was in Thornton's best interest. The advantage of a partial commutation is that it allows the claimant to invest a lump sum in income-bearing securities, thus supporting an income stream that incrementally increases over time to meet rising costs. Without a partial commutation, the claimant receives a fixed weekly payment that, over time, will decrease in value as inflation rises. American Interstate knew that in order to obtain a partial commutation, an injured worker must first obtain a ruling that, as a result of workplace injuries, the claimant is PTD.

American Interstate was also aware that Thornton operated on a relatively tight budget after the accident, with several bills to be paid. His budget was modest and reasonable, but without a whole lot of room after payment of expenses.

Thus, by delaying the determination that Thornton was PTD, American Interstate delayed Thornton's receipt of a partial commutation. The length of the delay was approximately one-and-a-half years.

**G. Application of Due Process Principles.** At the outset, candor requires us to observe that the caselaw of punitive damages in the post-*Gore/Campbell* world is rich and varied.[7] The cases uniformly adopt the framework established in these cases, but there are wide variations in the outcomes. Although the Supreme Court has provided guidelines for us to apply, we think the Supreme Court expects us to exercise our best independent judgment based on the specific facts of this case.

In engaging in our de novo review of the constitutionality of punitive damages awards, we do not seek to substitute our best judgment for that of the jury; rather, we seek to uphold the jury's punitive damage verdict to the greatest extent possible. *See Cooper Indus., Inc.,* 532 U.S. at 443, 121 S. Ct. at 1689; *Simon,* 113 P.3d at 69–71.

1. *Reprehensibility.* We first begin our analysis with the most important factor, namely, the reprehensibility of American Interstate's conduct. At the outset, this is not a case where the conduct of the defendant may be characterized as "extraordinarily reprehensible," such as that involved in cases like *Williams II.* In *Williams II,* the defendant engaged in "a prolonged pattern of egregious and deceitful conduct that posed an extreme threat to the health and safety of a significant segment of the population of the state." *Goddard,* 179 P.3d at 645, (describing the conduct in *Williams II*).

Yet, there are features in this file that are quite troubling. It was clear early on that Toby Thornton suffered an injury that rendered him

---

[7]Although a state constitutional claim is made under article I, section 9 of the Iowa Constitution, American Interstate does not suggest a framework different from *Gore/Campbell* should be applied under the Iowa Constitution. Under the circumstances, we apply the prevailing federal standards to both claims, reserving the right to apply the standard more stringently under the Iowa Constitution. *Tyler,* 830 N.W.2d at 291–92; *State v. Ochoa,* 792 N.W.2d 260, 267 (Iowa 2010). Here, considering the relief that has been provided under federal constitutional analysis, we decline to provide further relief under the Iowa Constitution given the posture of the case.

permanently and totally disabled under Iowa's workers' compensation laws. No one, including the employees of American Interstate, ever really seemed to think otherwise.

At first, American Interstate provided appropriate benefits and assistance to Toby Thornton. His case manager, Luann Miller, was quite proactive and effective in assisting Thornton with housing, transportation, and medical issues. Thornton is a likeable, indeed remarkable, person and got along well with most people, including Miller.

Matters deteriorated, however, with a failed mediation and the collapse of settlement discussions. In particular, American Interstate became frustrated with the fact that an approach to settlement when Thornton was uncounseled foundered and settlement efforts were further complicated when Thornton hired lawyer Siems to represent him. American Interstate concluded Siems was making unreasonable settlement demands and seeking a recovery in excess of what would be afforded under Iowa's workers' compensation laws. After a failed mediation session, American Interstate continued to express a desire to settle the matter on terms American Interstate considered generous, but the company did not receive the response it desired from Siems.

As a result, American Interstate decided to play tough. If Thornton was going to be unreasonable in settlement, American Interstate would be unreasonable in litigation. Although American Interstate's lawyer advised that there was no substantial basis to contest that Thornton was permanently and totally disabled, a position adopted consistently internally by American Interstate soon after Thornton's injury, American Interstate now decided to be obstinate—or in the words of its claims vice president, "bullheaded."

The chosen weapon was a defense in the PTD proceeding that Thornton, in fact, could benefit from vocational rehabilitation and could find competitive employment that would prevent a finding of PTD. In the four years that had elapsed since the accident, American Interstate showed zero interest in vocational rehabilitation for Thornton. Now, as a chest-pounding tactical response to attorney Siems' perceived intransigence, American Interstate cranked up a poorly developed and unsubstantiated defense to a PTD determination; namely, that, voila, Thornton could in fact be sufficiently rehabilitated and find competitive employment in Monona, Iowa.

American Interstate thus let the competitive game it sought to play trump its fundamental and basic obligations to Toby Thornton. Attorney Siems was not injured by this course of conduct. In its competitive zeal to not be pushed around by an aggressive plaintiff's attorney, American Interstate acted in a fashion that sought to take advantage of Thornton's financial position, which, at least in the medium to long term, would be precarious without a partial commutation, and his vulnerability as a disabled person.

With that background, we turn to application of the five factors suggested in *Campbell* and *Gore* that can assist the court in determining the degree of reprehensibility.

The first factor is whether the harm was physical, as compared to economic. We have concluded that the bad-faith claim against American Interstate related to the wheelchair lacks merit, and as a result, the remaining direct harm is not physical in nature. That is not the end of the matter, however, as in both *Gore* and *Campbell*, state courts eventually awarded substantial punitive damages cases in cases involving only economic harm. While this case does not involve the kind of personal

injury that was present in other cases, such as *Williams II*, bad-faith denial of workers' compensation rights shows indifference to plaintiffs' mental health and peace of mind. *Century Sur. Co. v. Polisso*, 43 Cal. Rptr. 3d 468, 499 (Ct. App. 2006). The bad faith of American Interstate must have caused substantial mental distress to an individual forced to fight his insurance company on a worthless and manufactured issue.

The second factor is whether the tortious conduct showed an indifference to or reckless disregard of the health or safety of others. The actions of American Interstate show they did not consider the impact their actions would have on Thornton's mental state as a workers' compensation beneficiary seeking to navigate Iowa's workers' compensation system. *See Buhmeyer*, 446 F. Supp. 2d at 1048–49; *Century Sur. Co.*, 43 Cal. Rptr. 3d at 499.

The third factor is whether the plaintiff was financially vulnerable. We think this factor cuts in favor of the plaintiff. As American Interstate points out, it continued to pay workers' compensation benefits throughout the course of litigation. As a result, at all times relevant, Thornton received a biweekly income in workers' compensation payments plus social security disability payments. In addition, all his medical bills were being paid by American Interstate.

Yet, in cases involving long-term PTD, the value of income benefits which are paid on a fixed schedule slowly erodes over time because there is no inflation adjustment to the payments. As a result, while the replacement income may seem satisfactory today, over time a worker's financial position is increasingly precarious. American Interstate's denial of PTD, and the resulting delay in the partial-commutation process, clearly put some marginal financial pressure on Thornton. *Buhmeyer*, 446 F. Supp. 2d at 1049.

The fourth factor is whether conduct involved an isolated incident or a repeat misconduct. Here, the conduct does not appear to have involved persons other than Thornton. American Interstate, however, engaged in repeated acts against Thornton in its campaign to delay a PTD determination and consequently delay a partial commutation of Thornton's PTD benefits. The conduct of American Interstate, however, is not similar to the extensive pattern and practice of deceit found in *TXO* or *Gore.* *See Gore*, 517 U.S. at 563, 116 S. Ct. at 1593; *TXO*, 509 U.S. at 462, 113 S. Ct. at 2722.

The fifth factor is whether the conduct involved intentional malice, trickery, or deceit, or mere accident. This case does not involve simple negligence on the part of an insurance company. American Interstate put on a bad-faith defense in retaliation for Thornton's refusal to settle the matter on terms preferred by the company. It attempted to convince the deputy commissioner that the existence of vocational rehabilitation programs, and the failure of Thornton to access them, somehow contradicted the repeatedly accepted view within American Interstate that Thornton was PTD. This factor cuts against American Interstate.

We conclude based on our review of the facts that the conduct of American Interstate can be characterized as reprehensible. It plainly does not approach the character of that presented in the most egregious cases, but on the PTD bad-faith issue, the conduct of American Interstate is simply, plainly, and completely unacceptable and worthy of censure in the form of a substantial punitive damages award.

2. *Actual harm to potential harm.* Turning to the second *Gore/Campbell* factor, we note the tendency of some courts to race to ratios in their analysis of the validity of the amount of punitive damages in a given case. But reprehensibility is clearly the most important factor, and

the ratio of punitive damages to compensatory damages, as is apparent in cases like *TXO*, is not a be-all and end-all. *See TXO*, 509 U.S. at 462, 113 S. Ct. at 2722. Yet, it provides a general measure that can assist the court in ensuring a degree of uniformity in punitive damages cases and in right-sizing the punitive damages in a particular case.

In this case, the jury awarded punitive damages at a ratio of nearly 18 to 1. We have concluded, however, that the actual damages in this case must be reduced from $382,000 to $58,452.42. As a result, if we were to maintain the ratio of 18 to 1 that the jury determined was appropriate in this case, the amount of punitive damages would be reduced to a little over a million dollars.

We recognize that the primary factor in determining punitive damages is reprehensibility. And, a ratio of 18 to 1 does appear in the cases and is not necessarily out of bounds, particularly when there are aggravating features as in *TXO, Wilson, Ryan*, and *Williams II.* But there was no evidence in this case, for instance, of a companywide pattern and practice of bad-faith conduct or widespread personal injuries caused by deceit. Further, there is no compelling reason to believe that the damages do not generally reflect the actual harm caused in this case as in *Wolf.* 690 N.W.2d at 895–96. Under these circumstances, the relatively high 18 to 1 ratio raises the judicial eyebrow and suggests a problem of proportionality that is at the heart of due process analysis.

3. *Comparison to civil and criminal penalties.* The third *Gore/Campbell* factor has less importance here in punitive damages analysis. The relative lack of utility of the third guidepost has been noted by the commentators. *See* N. William Hines, *Marching to a Different Drummer: Are Lower Courts Faithfully Implementing the Evolving Due Process Guideposts to Catch and Correct Excessive Punitive Damages*

*Awards?*, 62 Cath. U. L. Rev. 371, 394 (2013). There are no applicable civil or criminal penalties to compare the conduct of American Interstate against. Iowa Code section 86.13 imposes a penalty for denial of certain workers' compensation payments, but this section does not apply to the kind of misconduct imposed in this case. At a minimum, it can be said that there is nothing in the third *Gore/Campbell* factor that supports a ratio of punitive damages to actual damages that falls outside the single digits.

4. *Application of* Gore/Campbell *factors.* While we strive to uphold the jury's verdict to the extent possible on the punitive damages issue, we think a double-digit punitive damages award as sought by the plaintiff in this case pushes beyond the upward limit established by the due process punitive damages cases of the United States Supreme Court. Yet, the conduct here is reprehensible: delaying a determination of PTD and the resulting delay in granting partial commutation for a severely injured individual, based only on a frantic last minute scramble to establish a fact contrary to repeated actions and statements of the insurer and its representative to try to get their way.

In considering the *Gore/Campbell* factors, we conclude the highest punitive damage award that could be maintained based on the record in this case and this court's rulings in this appeal is $500,000. The conduct in this case is worthy of censure and demands a measure of punishment and deterrence. But after two trips to the Iowa Supreme Court and three years of litigation, a $500,000 punitive damage award is as far as we are willing to go based upon the one-time event in this case in order to vindicate the state's legitimate objectives of punishment and deterrence.

Because our review of challenges to punitive damages under the Federal Due Process Clause is de novo, there is no basis for remittitur. *In*

*re Lorazepam & Clorazepate Antitrust Litig.*, 261 F. Supp. 3d 14, 18 (D.D.C. 2017); *Ross v. Kansas City Power & Light Co.*, 293 F.3d 1041, 1049 (8th Cir. 2002); *Simon,* 113 P.3d at 69–71. As a result, on remand, the district court should enter judgment in favor of the plaintiff in the amount of $500,000.

## VI. Conclusion.

We conclude that Thornton failed to offer substantial evidence to support his claim that American Interstate engaged in bad faith in connection with the alleged delay in providing a replacement wheelchair to him. As a result, American Interstate was entitled to judgment on the bad-faith claim based on the delay in acquisition of the replacement wheelchair.

With respect to the PTD bad-faith claim, we find that the evidence supports actual damages of no more than $58,452.42. Further, we find that the maximum amount of punitive damages that may be awarded is $500,000. For the reasons expressed in this opinion, remittitur is not necessary. The district court on remand should enter judgment in the amount of $58,452.42 in compensatory damages and $500,000 in punitive damages.[8]

**REVERSED AND REMANDED WITH INSTRUCTIONS.**

All justices concur except Christensen, C.J., and Oxley, J., who take no part.

---

[8]In light of our disposition, it is unnecessary to address the question of whether attorney Siems should be disqualified as attorney for Thornton in any subsequent retrial.